IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| STEPHEN P. FAHEY, AS RECEIVER FOR AGRIDIME, LLC, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. 4:25-CV- 4:26-cv-38 |
| TAYLOR BANG CATTLE SALES, LLC, LONNIE LEE JAEGER, LARRY SORENSON, TODD BANG, TERRALD BANG, CHAD LORSON, PATRICK MORGAN, MARIO OST, LANCE LENTON, CATTLE EMPIRE, LLC, AND BROOKOVER FEED YARDS, INC., | § § § § § § § § § § § § | |
| *Defendants*. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT FOR DECLARATORY RELIEF**

Plaintiff Stephen P. Fahey, in his capacity as the Court-appointed Receiver for Agridime LLC ("Plaintiff" or "Receiver"), files this Original Complaint for Declaratory Relief against Taylor Bang Cattle Sales, LLC, Lonnie Lee Jaeger, Larry Sorenson, Todd Bang, Terrald Bang, Chad Lorson, Patrick Morgan, Mario Ost, Lance Lenton, (collectively, the "Ranchers"), Cattle Empire, LLC, and Brookover Feed Yards, Inc. (collectively, the "Feedyards" and together with the Ranchers, "Defendants") and respectfully states as follows:

**I.**
**NOTICE OF RELATED CASE**

Pursuant to Local Rule 3.3, Receiver discloses what he believes to be a related case as defined by Local Rule 3.3(b). The related case is *SEC v. Agridime LLC et al.*, Civil Action No. 4:23-cv-1224-P, which is pending in the United States District Court for the Northern District of Texas, Fort Worth Division. The Honorable Mark T. Pittman is presiding.

## II.
## OVERVIEW

1.      By filing this Compliant, the Receiver seeks a declaration from this Court regarding what preference, if any, should be given to the Ranchers and Feedyards regarding their respective claims to certain proceeds currently held by the Receiver.

2.      The Receivership here arises out of the fraudulent Ponzi scheme perpetrated by Josh Link, Jed Wood, and their company Agridime LLC ("Agridime") (collectively, the "Receivership Defendants").

3.      In order to halt the ongoing, fraudulent, and unregistered offering of securities and an active Ponzi scheme perpetrated by the Receivership Defendants, on December 11, 2023, the Securities and Exchange Commission (the "SEC") commenced a lawsuit against the Receivership Defendants.[1] On the same date, the Court signed an Order appointing Stephen P. Fahey as Receiver over Receivership Defendants (the "Order").[2]

4.      Between 2021 and 2023, Agridime raised approximately $191 million from more than 2,100 investors in multiple states, by selling investment contracts related to the purported purchase, feeding of, and later sale of cattle. Agridime promised these investors artificially high, guaranteed annual returns. These investments were too good to be true, as the Receivership Court made a finding that Agridime was operated as a Ponzi scheme since October 1, 2021.[3]

5.      As part of its scheme, the Receivership Defendants also engaged with individuals who actually owned cattle. In a similar vein as the investors, these cattle producers entered into contracts with Agridime wherein Agridime took possession of the cattle, engaged with third-party

---

[1]   Unless otherwise stated, citations to Court records herein are from the case styled *SEC v. Agridime LLC, et al.*, Civil Action No. 4:23-cv-1224-P.

[2]   ECF No. 15.

[3]   ECF No. 118.

feed yards that fed those cattle until they reached a certain weight, at which time the cattle were sold and processed, with similar, artificially high returns being returned to the individuals who owned the cattle.

6.    Since the placement of Agridime in the Receivership, a dispute has arisen regarding the right to proceeds from several thousand head of cattle that were on feed at the Feedyards purportedly in Agridime's name (the "Disputed Cattle Proceeds"). Specifically, the Ranchers who delivered these cattle to the Feedyards have filed certain statutory trust claims with the United States Department of Agriculture ("USDA") regarding claims for payment for the cattle. Relatedly, a dispute has since arisen concerning whether—and if so, to what extent—the Feedyards are entitled to proceeds from the sale of cattle under the various financing and security agreements they had with Agridime.

7.    As the Court is well aware, Mario Ost, Lance Lenton, and Lonnie Jaeger (collectively, the "North Dakota Ranchers") and the Feedyards have asserted, on multiple occasions, competing claims to assets held by the Receiver—specifically, proceeds from the sale of cattle that were (at one time) owned by the North Dakota Ranchers and fed by the Feedyards.[4]

8.    In addition to the North Dakota Ranchers and the Feedyards, the Receiver is filing this Complaint so that all necessary parties are before this Court, allowing the Court to make a determination regarding the validity of all claims made, not just the claims that USDA deemed as "Apparently Valid" or the claims of the parties who have previously made appearances in this matter.

9.    While the Defendants may have claims to Receivership assets once this Court authorizes the Receiver to make an equitable distribution to claimants, at this stage in the

---

[4]    See ECF Nos. 63-66, 107-108, 173-175, 189-190.

Receivership, the Receiver does not believe the Defendants possess claims for superior payment rights and seeks a declaration from this Court regarding whether they have valid claims against the Disputed Cattle Proceeds that require any preference over other claimants in the Receivership.

## III.
## PARTIES

10.     The Receiver is the court appointed Receiver for the Receivership Defendants in the case styled *SEC v. Agridime LLC et al.* pending in the Receivership Case. The Receiver is a resident and citizen of the State of Texas.

11.     Taylor Bang Cattle Sales, LLC is a North Dakota limited liability company with its principal place of business in Killdeer, North Dakota. It can be served with process through its registered agent, Taylor Bang, at 196 109th Ave NW, Killdeer, North Dakota 58640.

12.     Lonnie Lee Jaeger is a natural person and citizen and resident of North Dakota. Jaeger can be served at 54 72nd St N, Towner, North Dakota 58788, or wherever he may be found.

13.     Larry Sorenson is a natural person and citizen and resident of North Dakota. Sorenson can be served at Box 752, Watford City, North Dakota 58854, or wherever he may be found.

14.     Todd Bang is a natural person and citizen and resident of North Dakota. Todd Bang can be served at 11321 5th St NW, Killdeer, North Dakota 58640, or wherever he may be found.

15.     Terrald Bang is a natural person and citizen and resident of North Dakota. Terral Bang can be served at 11319 5th St NW, Killdeer, North Dakota 58640, or wherever he may be found.

16.     Chad Lorson is a natural person and citizen and resident of Kansas. Lorson can be served at 122 E Broadway, Hope, Kansas 67451, or wherever he may be found.

17.     Patrick Morgan is a natural person and citizen and resident of Kansas. Morgan can be served at 6749 E Shepherds Crossing Street, Bel Aire, Kansas 67226, or wherever he may be found.

18.     Mario Ost is a natural person and citizen and resident of North Dakota. Ost can be served at 1504 34th Ave SE, Minot, North Dakota 58701, or wherever he may be found.

19.     Lance Lenton is a natural person and citizen and resident of North Dakota. Lenton can be served at 5612 20th Ave N, Norwich, North Dakota 58768, or wherever he may be found.

20.     Cattle Empire, LLC is a Kansas limited liability company with its principal place of business in Satanta, Kansas. It can be served with process through its registered agent, Roy N. Brown, at 2425 Road DD, Satanta, Kansas 67870.

21.     Brookover Feed Yards, Inc. is a Kansas corporation with its principal place of business in Garden City, Kansas. It can be served with process through its registered agent, E. C. Brookover, Jr., at 50 Grandview Dr., Garden City, Kansas 67846.

**IV.**
**JURISDICTION AND VENUE**

22.     As the Court that appointed the Receiver, this Court has subject matter jurisdiction over any claim brought by the Receiver to execute his Receivership duties.

23.     Venue for this action is proper in the Northern District of Texas because: (1) this action is ancillary to the SEC proceeding referenced above, which are already pending in this District; (2) the Receiver was appointed in this District; and (3) this action involves Receivership Assets within the meaning of the Order, which expressly states that the Receiver is authorized, empowered and directed to institute such actions and legal proceedings as may be necessary to enforce the Order with this Court.

24.     Furthermore, Cattle Empire, Brookover, Jaeger, Lenton, and Ost have already appeared and made filings in the Agridime Receivership case.

---

**V.**
**BACKGROUND FACTS**

**A.**    **Agridime's Involvement in the Cattle Feeding Business**

25.    The Receivership Defendants marketed and sold cattle contracts to investors under the guise that Agridime would purchase cattle and then raise and sell them at a higher, guaranteed price. This scheme was marketed to investors with the promise of artificially high returns with little to no risk.[5]

26.    As part of its scheme, the Receivership Defendants also engaged with individuals who actually owned cattle, including the Ranchers. Specifically, these cattle producers entered into contracts with Agridime wherein Agridime engaged with third-party feedyards (including the Feedyards) that took possession of and fed the Ranchers' cattle until they reached a certain weight, at which time the cattle were sold and processed, with similar, artificially high returns being returned to the individuals who owned the cattle.

27.    Moreover, when the cattle were delivered to the third-party feedyards, Agridime received certain advances of funds from the Feedyards in exchange for granting a security interest in the cattle to the Feedyards. The payment of those funds was purportedly secured by the cattle on feed at the feedyard.

28.    A diagram that details this scheme is provided below:

---

[5]    One part of Agridime's business model was the use of contracted sales representatives, who engaged with individuals on behalf of Agridime to "sell and promote" the cattle contracts. In exchange, the salesperson would receive a 10% commission for each contract sold. Upon information and belief, some of the named defendants in this suit may have received commissions by selling and promoting the cattle contracts. These commission payments came not from revenue generated by legitimate business, but from monies contributed by defrauded investors.



29.     After the SEC's suit was filed, several thousand head of cattle were on feed at the Feedyards purportedly in Agridime's name. Pursuant to the Court's Order entered on April 26, 2024, the cattle were to be fed and sold in accordance with ordinary industry standards and practices.[6]

30.     Also, per Court order, the Receiver has retained the sales proceeds from these cattle (less the costs of feed and care of the animals).[7] These funds represent a significant percentage of the current assets of the Receivership.

**B.      The Ranchers file Statutory Trust Claims with the USDA**

31.     Following the SEC's filing of the underlying complaint, the Ranchers filed statutory trust claims with the USDA, seeking the preferential recovery of the proceeds from the sale of the cattle now held by the Receiver. Specifically, a total of twenty-four claims were made by the Ranchers under the Packers and Stockyards Act of 1921 (the "P&S Act"), which, in general, requires that packers hold assets in trust for the benefit of cash sellers in the event of non-payment. 7 U.S.C. §§ 181 – 229c. (the "Packer Trust Claims").

---

[6]   *See* ECF No. 95.

[7]   *See id.*; ECF No. 98.

32.     In addition, these same individuals, apparently at the direction of the USDA, also filed Dealer Trust Claims under a new amendment to the P&S Act—the Dealer Trust Act—which was established for the benefit of unpaid cash sellers of livestock. 7 U.S.C. § 217b. (the "Dealer Trust Claims"). A summary of the Ranchers and their statutory trust claims, as outlined by the USDA, is provided below[8]:

| Name | Dealer Trust Act | | P&S Act | |
|---|---|---|---|---|
| | Claim Amount | Date Claim Filed | Claim Amount | Date Claim Filed |
| Lonnie Lee Jaeger | $112,206.47 | 01/26/24 | $112,206.47 | 01/26/24 |
| Lonnie Lee Jaeger | $304,221.23 | 01/26/24 | $304,221.23 | 01/26/24 |
| Lonnie Lee Jaeger | $303,881.37 | 01/26/24 | $303,881.37 | 01/26/24 |
| Lonnie Lee Jaeger | $310,729.23 | 01/26/24 | $310,729.23 | 01/26/24 |
| Lonnie Lee Jaeger | $305,801.18 | 01/26/24 | $305,801.18 | 01/26/24 |
| Larry Sorenson | $547,747.20 | 02/13/24 | $547,747.20 | 02/13/24 |
| Larry Sorenson | $139,204.80 | 02/13/24 | $139,204.80 | 02/13/24 |
| Todd Bang | $91,683.18 | 02/16/24 | $91,683.18 | 02/16/24 |
| Todd Bang | $77,570.73 | 02/16/24 | $77,570.73 | 02/16/24 |
| Todd Bang | $78,325.41 | 02/16/24 | $78,325.41 | 02/16/24 |
| Terrald Bang | $91,683.18 | 02/16/24 | $91,683.18 | 02/16/24 |
| Terrald Bang | $77,570.73 | 02/16/24 | $77,570.73 | 02/16/24 |
| Terrald Bang | $78,325.41 | 02/16/24 | $78,325.41 | 02/16/24 |
| Chad Lorson | $163,705.70 | 02/09/24 | $163,705.70 | 02/09/24 |
| Chad Lorson | $164,818.40 | 02/09/24 | $164,818.40 | 02/09/24 |
| Chad Lorson | $360,035.44 | 02/09/24 | $360,035.44 | 02/09/24 |
| Patrick Morgan | $201,420.17 | 02/22/24 | $201,420.17 | 02/22/24 |
| Patrick Morgan | $787,828.87 | 02/22/24 | $787,828.87 | 02/22/24 |
| Patrick Morgan | $154,522.30 | 02/22/24 | $154,522.30 | 02/22/24 |
| Patrick Morgan | $197,640.39 | 02/22/24 | $197,640.39 | 02/22/24 |
| Patrick Morgan | $226,023.16 | 02/22/24 | $226,023.16 | 02/22/24 |
| Taylor Bang Cattle Sales, LLC | $235,437.20 | 03/19/24 | $235,437.20 | 03/19/24 |
| Mario Ost | $387,840.00 | 03/19/24 | $387,840.00 | 03/19/24 |
| Lance Lenton | $293,157.20 | 03/13/24 | $293,157.20 | 03/13/24 |

---

[8]   This Chart is derived from the USDA's summary spreadsheet provided to the Receiver, and the Receiver has included this for illustrative purposes only. Some of the information contained within the USDA spreadsheet is inconsistent with the information contained in the underlying claim documents submitted to the USDA. These discrepancies may affect the timeliness or validity of the claims.

33.     To date, the USDA has made a non-binding determination that four claimants (totaling $1,943,550.01 in claims) have "Apparently Valid" claims under both the P&S Act and the Dealer Trust Act. Interestingly, the "Apparently Valid" Packer Trust Claims and Dealer Trust Claims are identical.

34.     While the USDA received and processed the filed claims in this matter, its analysis is not a final agency determination that the Receiver can rely on as a binding decision that would otherwise require him to pay the amounts that USDA has tentatively termed as "Apparently Valid."

**C.     Feedyards claims regarding their purported lien positions**

35.     As mentioned above, the Feedyards have made competing claims to the Disputed Cattle Proceeds based on certain agreements made with Agridime that purportedly granted the Feedyards a security interest in the cattle and the proceeds from those cattle (*e.g.*, the Disputed Cattle Proceeds). These claims arise from certain financing agreements that the Feedyards entered into with Agridime, by which the Feedyards advanced funds to Agridime as part of the feeding arrangement.

36.     Specifically, upon information and belief, both Cattle Empire and Brookover advanced several hundred thousand dollars to Agridime in 2023. Again, the Feedyards claim that such advances were made as part of their financing agreements with Agridime, and the repayment of the advanced funds were secured by the cattle that were delivered to their respective feedyards.

37.     The Feedyards take the position that their security interests take priority over any claim to the proceeds from the cattle by the North Dakota Ranchers or any other party, including the Receiver.

**VI.**
**CAUSES OF ACTION**

**A.     Count One: Declaratory Judgment (Packer Trust Claims)**

38.     The Receiver re-alleges and incorporates by reference all the foregoing paragraphs.

39.     There exists an actual and live controversy between the Receiver, the Ranchers, and the Feedyards regarding the validity of the Packer Trust Claims.

**1.      Controversy regarding the creation of the Packer Trust**

**a.      Packer and Cash Sale Requirement**

40.     The P&S Act, which has been in place since the 1920s "to secure the free and unburdened flow of livestock across the nation from producers to consumers," requires that packers hold assets in trust for the benefit of cash sellers in the event of non-payment by a packer. *United States v. Haun*, 124 F.3d 745, 748 (6th Cir. 1997).

41.     Specifically, the P&S Act, provides that "[a]ll livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers…." 7 U.S.C. § 196(b).

42.     A "packer" is defined as "any person engaged in the business (a) of buying livestock in commerce for purposes of slaughter, or (b) of manufacturing or preparing meats or meat food products for sale or shipment in commerce, or (c) of marketing meats, meat food products, or livestock products in an unmanufactured form acting as a wholesale broker, dealer, or distributor in commerce." 7 U.S.C. § 191.

43.     Here, an actual and live controversy exists regarding (1) whether Agridime was a "packer" under the P&S Act, and (2) whether the dealings between Agridime and the Ranchers constitute cash sales subject to the protections of the P&S Act.

**b.      Timeliness of Claims**

44.     The P&S Act provides that the "unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received, within thirty days of the final date

for making a payment under section 228b of this title, or within fifteen business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, the seller has not preserved his trust under this subsection." 7 U.S.C. § 196(b). The trust is preserved by giving written notice to the packer and by filing such notice with the Secretary of the USDA. *Id*.

45.     Here, an actual and live controversy exists regarding whether the Ranchers timely provided their written notice to the purported packer here (Agridime) and timely made their filing with the USDA in order to receive the benefits of the P&S Act.

**B.     Count Two: Declaratory Judgment (Dealer Trust Claims)**

46.     The Receiver re-alleges and incorporates by reference all the foregoing paragraphs.

47.     There exists an actual and live controversy between the Receiver, the Ranchers, and the Feedyards regarding the validity of the Dealer Trust Claims.

**1.     Controversy regarding the creation of the Dealer Trust**

**a.     Dealer and Cash Sale Requirements**

48.     Similar to the P&S Act, the Dealer Trust Act requires a livestock dealer to hold certain assets in trust for the benefit of unpaid sellers of livestock. Under the Dealer Trust Statute, "all livestock purchased by a dealer in cash sales and all inventories of, or receivables or proceeds from, such livestock shall be held by such dealer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid cash sellers." 7 U.S.C. § 217b(a)(1). A "dealer" is defined as "any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser." 7 U.S.C. § 201(d). Thus, under the Dealer Trust Statute, no trust is created unless a cash seller actually sells and delivers cattle to a dealer.

49.     Because the Dealer Trust Act is a new statute, enacted during the Biden administration as part of the massive Consolidated Appropriations Act passed in December 2020, there is no case law—let alone controlling case law—interpreting its relevant provisions.

50.     Here, an actual and live controversy exists regarding (1) whether Agridime was, in fact, a dealer under the Dealer Trust Statute, and (2) whether the dealings between Agridime and the Ranchers constitute cash sales subject to the protections of the Dealer Trust Statute.

### b.     Timeliness of Claims

51.     Payment on a cash sale is due "before the close of the next business day following the purchase of livestock and transfer of possession thereof . . ." 7 U.S.C. § 228b. An unpaid cash seller loses the benefit of the trust established by the Dealer Trust Statute unless the unpaid cash seller provides written notice to the dealer and files a claim with the USDA "(1) within 30 days of the final date for making a payment under section 228b of this title in the event that a payment instrument has not been received; or (2) within 15 business days after the date on which the seller receives notice that the payment instrument promptly presented for payment has been dishonored." 7 U.S.C. § 217b(b).

52.     Here, an actual and live controversy exists regarding whether the Ranchers timely provided their written notice to the purported dealer here (Agridime) and timely made their filing with the USDA in order to receive the benefits of the Dealer Trust Statute.

### C.     <u>Count Three: Declaratory Judgment (Feedyard Liens)</u>

53.     The Receiver re-alleges and incorporates by reference all the foregoing paragraphs.

54.     There exists an actual and live controversy between the Receiver, the Ranchers, and the Feedyards regarding the validity, priority, and extent of the liens claimed by the Feedyards.

55.      As part of the ongoing Ponzi scheme, ranchers entered into contracts with Agridime and delivered cattle to various feedyards for care and feeding. Upon delivery, Agridime

claimed ownership of the cattle and engaged third-party feedyards to feed them until they reached market weight. The cattle were then sold and processed, with artificially high returns paid back to the ranchers who had delivered them.

56.     Under this same scenario, the Ranchers, including the North Dakota Ranchers, delivered cattle to the Feedyards for care and feeding. The Feedyards advanced funds to Agridime to finance the cattle while in the possession of the Feedyards. As part of this financing, the Feedyards required Agridime to execute loan documents which, among other things, granted the Feedyards a security interest in the cattle and their proceeds. The Feedyards assert their liens attach to the Disputed Cattle Proceeds.

57.     Upon receipt of the cattle, the North Dakota Ranchers claim that the Feedyards had information sufficient to put them on notice that Agridime did not own the cattle. Hence, an actual live controversy exists regarding whether the Feedyards claimed liens are valid liens, and if so, the priority and extent of the claimed liens.

**D.     In the Alternative, Count Four: Declaratory Judgment (Timing of Payment)**

58.     The Receiver re-alleges and incorporates by reference all the foregoing paragraphs.

59.     There exists an actual and live controversy directly between the Receiver and the North Dakota Ranchers, and indirectly between the Receiver and the Feedyards regarding the timing of any payments, including of the Disputed Cattle Proceeds. The North Dakota Ranchers have filed several motions for payment.[9] As noted above, the Feedyards assert a lien they contend has priority over such proceeds from which the North Dakota Ranchers seek payment.

60.     The Receiver is tasked with, *inter alia*, recovering improperly transferred funds and presenting the Receivership Court with a Liquidation Plan for the fair, reasonable, and efficient

---

[9]   ECF Nos. 173, 213, 215.

recovery and liquidation of all remaining, recovered Receivership Property.[10] Accordingly, the Receiver intends to present the Court with a recommendation for distribution plan, which the Court may consider in exercising its "broad powers and wide discretion" for determining appropriate relief. *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 840 (5th Cir. 2019). At that time, an orderly distribution plan addressing, *inter alia*, payments to Agridime creditors will be established.

61.    Depending on how the Court resolves the foregoing requests for declaratory judgment, the Receiver alternatively requests a declaratory judgment that any payment to the Ranchers and/or Feedyards be made as part of a final distribution plan.

**VII.**
**PRAYER**

For these reasons, the Receiver respectfully requests the Court set this matter for trial and, upon trial, enter a declaratory judgment, adjudging and declaring whether valid statutory trust claims exist that require any preference over other claimants in the Receivership; and whether the Feedyards have valid liens that require any preference over other claimants in the Receivership; and alternatively enter a declaratory judgment, adjudging and declaring that payments to the Ranchers and Feedyards, if any, be made as part of a final distribution plan; and granting the Receiver such other and further relief, general or special, as this Court may deem just and proper.

---

[10]   *See, e.g.*, ECF No. 15, ¶ 52.

Dated: January 12, 2026.

Respectfully submitted,

*/s/ Colin P. Benton*
Brant C. Martin
State Bar No. 24002529
brant.martin@wickphillips.com
David J. Drez III
State Bar No. 24007127
david.drez@wickphillips.com
Colin P. Benton
State Bar No. 24095523
colin.benton@wickphillips.com
Kyle K. Weldon
State Bar No. 24097192
kyle.weldon@wickphillips.com

**WICK PHILLIPS GOULD & MARTIN, LLP**
100 Throckmorton Street, Suite 1500
Fort Worth, Texas 76102
Telephone:    (817) 332-7788
Fax:              (817) 332-7789

-and-

John F. Massouh
State Bar No. 24026866
john.massouh@sprouselaw.com

**SPROUSE SHRADER SMITH PLLC**
P.O. Box 15008
Amarillo, Texas 79105
Telephone:    (806) 468-3300
Fax:              (806) 373-3454

**ATTORNEYS FOR STEVE FAHEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR AGRIDIME LLC**