**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| STEPHEN P. FAHEY, AS RECEIVER FOR AGRIDIME, LLC, | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | Civil Action No. 4:26-CV-00038-P |
| TAYLOR BANK CATTLE SALES, LLC, LONNIE LEE JAEGER, LARRY SORENSON, TODD BANK, TERRALD BANG, CHAD LORSON, PATRICK MORGAN, MARIO OST, LANCE LENTON, CATTLE EMPIRE, LLC, AND BROOKOVER FEED YARDS, INC., | § § § § § § § § § § | |
| *Defendants*. | § § | |

**DEFENDANTS CATTLE EMPIRE, LLC AND BROOKOVER FEED YARDS, INC.'S
(1) ANSWER TO PLAINTIFF'S ORIGINAL COMPLAINT FOR DECLARATORY
RELIEF [Dkt. 1]
AND
(2) COUNTER- AND CROSS-CLAIMS**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Defendants Cattle Empire, LLC ("Cattle Empire") and Brookover Feed Yards, Inc. ("Brookover"), (collectively the "Feedyards"), file this their Answer in response to Plaintiff's Original Complaint for Declaratory Relief [Dkt. 1] ("Complaint"), and in support of same would show as follows:

**I.
ANSWER**

In accordance with Federal Rule of Civil Procedure 8(b)(3), all allegations not expressly admitted herein are denied.

The headings used in Plaintiff's Complaint are included below solely to aid the organization of this Answer and its response to the Complaint and for no other purpose.

### "II.    Overview"

1.      The Feedyards admit that the Receiver seeks a declaration from this Court.

2.      Paragraph 2 makes no allegations against the Feedyards.  To the extent Paragraph 2 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

3.      The Feedyards admit that the Security and Exchange Commission (the "SEC") commenced a lawsuit on December 11, 2023, and that Stephen P. Fahey was appointed Receiver by Order of that date.  Feedyards lack specific knowledge as to the SEC's motivations in commencing litigation.  To the extent Paragraph 3 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

4.      The Feedyards admit that the Court made a finding that Agridime was operated as a Ponzi scheme since October 1, 2021.  To the extent Paragraph 3 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

5.      The Feedyards admit the allegations in Paragraph 5 that describe the relationship between Agridime and "cattle producers" which resulted in cattle in the possession of Agridime being placed at the Feedyards.  To the extent that Paragraph 5 purports to identify the ownership of cattle placed at the Feedyards, the Feedyards deny that the cattle producers owned the cattle placed at its Feedyard.  To the extent Paragraph 5 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

6.      The Feedyards admit the allegations of Paragraph 6.

7.      The Feedyards admit the allegations of Paragraph 7 that they and Defendants Jaeger, Lenton and Ost (the "North Dakota Ranchers") have asserted competing claims to sales

proceeds but, to the extent claims to other assets of the Receivership have been or are made under the doctrine of marshaling, deny that the claims are restricted to such sales proceeds.

8.    Paragraph 8 makes no allegations against the Feedyards.  To the extent Paragraph 8 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

9.    The Feedyards deny the allegation in Paragraph 9 to the extent it alleges they do not have claims for superior payment rights.  To the extent Paragraph 9 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

**"III.    Parties"**

10.    The feedyards admit the allegations of Paragraph 10.

11.    Paragraph 11 makes no allegations against the Feedyards.  To the extent Paragraph 11 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

12.    Paragraph 12 makes no allegations against the Feedyards.  To the extent Paragraph 12 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

13.    Paragraph 13 makes no allegations against the Feedyards.  To the extent Paragraph 13 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

14.    Paragraph 14 makes no allegations against the Feedyards.  To the extent Paragraph 14 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

15. Paragraph 15 makes no allegations against the Feedyards. To the extent Paragraph 15 makes allegations against parties other than the Feedyards, no response is required. Fed. R. Civ. P. 8(b)(1)(B).

16. Paragraph 16 makes no allegations against the Feedyards. To the extent Paragraph 16 makes allegations against parties other than the Feedyards, no response is required. Fed. R. Civ. P. 8(b)(1)(B).

17. Paragraph 17 makes no allegations against the Feedyards. To the extent Paragraph 17 makes allegations against parties other than the Feedyards, no response is required. Fed. R. Civ. P. 8(b)(1)(B).

18. Paragraph 18 makes no allegations against the Feedyards. To the extent Paragraph 18 makes allegations against parties other than the Feedyards, no response is required. Fed. R. Civ. P. 8(b)(1)(B).

19. Paragraph 19 makes no allegations against the Feedyards. To the extent Paragraph 19 makes allegations against parties other than the Feedyards, no response is required. Fed. R. Civ. P. 8(b)(1)(B).

20. Cattle Empire admits allegations contained in Paragraph 20.

21. Brookover admits allegations contained in Paragraph 21.

### "IV.    Jurisdiction and Venue"

22. The Feedyards admit that this Court has subject matter jurisdiction of the disputes in this case as alleged in paragraph 22. To the extent Paragraph 22 makes general allegations of jurisdiction against parties other than the parties in this case, no response is required. Fed. R. Civ. P. 8(b)(1)(B).

23. The Feedyards admit the allegations of Paragraph 23.

24. The Feedyards admit the allegations of Paragraph 24.

**"V.    Background Facts"**

**"A.    Agridime's Involvement in the Cattle Feeding Business"**

25. Paragraph 25 and footnote 5 make no allegations against the Feedyards. To the extent Paragraph 25 makes allegations against parties other than the Feedyards, no response is required. Fed. R. Civ. P. 8(b)(1)(B).

26. The Feedyards admit that they received cattle from Agridime but deny that (1) such cattle were "the Rancher's cattle" when they were delivered to the Feedyards, or (2) that the Feedyards had any role in any alleged "artificially high returns," as alleged in paragraph 26. To the extent Paragraph 26 makes allegations against parties other than the Feedyards, no response is required. Fed. R. Civ. P. 8(b)(1)(B).

27. The Feedyards admit that they made advances to Agridime that were secured by cattle delivered to them by Agridime, as alleged in paragraph 27. To the extent Paragraph 27 makes allegations against parties other than the Feedyards, no response is required. Fed. R. Civ. P. 8(b)(1)(B).

28. The Feedyards deny they participated in a "scheme," but admit that the diagram in Paragraph 28 generally describes the parties it depicts and the relationship between Agridime and the Feedyards. However, the Feedyards deny the allegations of the diagram to the extent the diagram alleges the cattle were delivered to the Feedyards "by the ranchers" but admit that the Ranchers voluntarily released possession of the cattle to Agridime and participated in shipment of the cattle to Agridime's selected location, the Feedyards. To the extent Paragraph 28 or the diagram makes allegations against parties other than the Feedyards, no response is required. Fed. R. Civ. P. 8(b)(1)(B).

29.    The Feedyards admit that cattle were on feed at the Feedyards in Agridime's name when the SEC's suit was filed, and deny the cattle were "purportedly" in Agridime's name.  The Feedyards admit the remainder of paragraph 29.

30.    The Feedyards admit that the Receiver has retained the sales proceeds, less feeding and care costs and financing costs for the feed and care costs, derived from Agridime's cattle placed with the Feedyards as alleged in paragraph 30.  The Feedyards are unable to admit or deny that the funds retained by the Receiver "represent a significant percentage of the current assets of the Receivership" for lack of knowledge.

**"B.    The Ranchers file Statutory Trust Claims with the UDSA"**

31.    Paragraph 31 makes no allegations against the Feedyards.  To the extent Paragraph 31 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

32.    Paragraph 32 make no allegations against the Feedyards.  To the extent Paragraph 32 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

33.    Paragraph 33 makes no allegations against the Feedyards.  To the extent Paragraph 33 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

34.    Paragraph 34 makes no allegations against the Feedyards.  To the extent Paragraph 34 makes allegations against parties other than the Feedyards, no response is required.  Fed. R. Civ. P. 8(b)(1)(B).

**"C.    Feedyards claims regarding their purported lien positions"**

35.    The Feedyards admit the allegations of Paragraph 35.

36.    The Feedyards admit the allegations of Paragraph 36.

37.    Without waiving any alternative theories of priority, including but not limited to the equitable doctrine of marshaling, the Feedyards admit the allegations of Paragraph 37.

## "VI.    Causes of Action"

### "A.    Count One:  Declaratory Judgment (Packer Trust Claims)"

38.    The Feedyards incorporate by reference their responses to the preceding paragraphs.

39.    The Feedyards admit the allegations of Paragraph 39.

### "1.    Controversy regarding the creation of the Packer Trust"

#### "a.    Packer and Cash Sale Requirement"

40.    Paragraph 40 contains a recital of law, to which response is not necessary. However, to the extent a response is necessary, the Feedyards admit the paragraph correctly quotes from the cited case and states the general rule of law.

41.    Paragraph 41 contains a recital of law, to which response is not necessary. However, to the extent a response is necessary, the Feedyards admit the paragraph correctly quotes from the cited statute.

42.    Paragraph 42 contains a recital of law, to which response is not necessary. However, to the extent a response is necessary, the Feedyards admit the paragraph correctly quotes from the cited statute.

43.    The Feedyards admit the allegations of Paragraph 43.

#### "b.    Timeliness of Claims"

44.    Paragraph 44 contains a recital of law, to which response is not necessary. However, to the extent a response is necessary, the Feedyards admit the paragraph correctly quotes from the cited statute and states the general rule of law.

45.    The Feedyards admit the allegations of Paragraph 45.

**"B.    Count Two:  Declaratory Judgment (Dealer Trust Claims)"**

46.    The Feedyards incorporate by reference their responses to the preceding paragraphs.

47.    The Feedyards admit the allegations of Paragraph 47.

**"1.    Controversy regarding the creation of the Dealer Trust"**

**"a.    Packer and Cash Sale Requirements"**

48.    Paragraph 48 contains a recital of law, to which response is not necessary. However, to the extent a response is necessary, the Feedyards admit the paragraph correctly quotes from the cited statute and states the general rule of law.

49.    The Feedyards admit the allegations of Paragraph 49.

50.    The Feedyards admit the allegations of Paragraph 50.

**"b.    Timeliness of Claims"**

51.    Paragraph 51 contains a recital of law, to which response is not necessary. However, to the extent a response is necessary, the Feedyards admit the paragraph correctly quotes from the cited statute and states the general rule of law.

52.    The Feedyards admit the allegations of Paragraph 52.

**"C.    Count Three:  Declaratory Judgment (Feedyard Liens)**

53.    The Feedyards incorporate by reference their responses to the preceding paragraphs.

54.    The Feedyards admit the allegations of Paragraph 54.

55.    The Feedyards deny (1) that they participated in a "scheme" or that or (2) that the Feedyards had any role in any alleged "artificially high returns," as alleged in Paragraph 55.

Further, the Feedyards deny the allegations that the cattle were delivered to the Feedyards by the ranchers but admit that the Ranchers voluntarily released possession of the cattle to Agridime and participated in shipment of the cattle to Agridime's selected location, the Feedyards. To the extent Paragraph 55 makes allegations against parties other than the Feedyards, no response is required. Fed. R. Civ. P. 8(b)(1)(B).

56.    To the extent the word "scenario" includes an allegation that the Feedyards participated in a "scheme," the Feedyard deny that allegation. Further, the Feedyards deny the allegations that the cattle were delivered "to the Feedyards for care and feeding" by the ranchers but admit that the Ranchers voluntarily released possession of the cattle to Agridime and participated in shipment of the cattle to Agridime's selected location for feeding and care, the Feedyards. The Feedyards admit the remaining allegations of Paragraph 56

57.    The Feedyards admit that the North Dakota Ranchers made after-the-fact claims concerning notice but deny the substance of the allegation. The Feedyards admit there is a live controversy concerning their lien claims.

**"D.    In the Alternative, Count Four:    Declaratory Judgment (Time of Payment)"**

58.    The Feedyards incorporate by reference their responses to the preceding paragraphs.

59.    The Feedyards admit the allegations of Paragraph 59 to the extent Paragraph 59 includes the Feedyards. To the extent Paragraph 59 makes allegations against parties other than the Feedyards, no response is required. Fed. R. Civ. P. 8(b)(1)(B).

60.    Paragraph 60 contains a recital of law and a proposed plan for payment, to which response is not necessary. However, to the extent Paragraph 60 alleges that priority payment

pursuant the Feedyard's security interest must be delayed, the Feedyards deny the allegation and are opposed.

61.    Paragraph 61 contains a hypothetical prayer for relief, but to the extent payment to the Feedyards would be delayed, the Feedyards are opposed.

### "Prayer"

62.    Plaintiffs' prayer does not assert any factual or legal allegations, but rather identifies several alternative forms of relief sought by Receiver, to which no answer is necessary. To the extent that an answer is necessary, the Feedyards incorporate by reference the relief sought by the Feedyards in their prayer below.

## II.
## AFFIRMATIVE DEFENSES AND OTHER DEFENSIVE PLEADINGS

63.    The paragraphs above and below are incorporated by reference as if restated herein in their entirety.

64.    The Feedyards assert the following affirmative defenses and other defensive pleadings, pleaded in the alternative to the extent necessary, without assuming any burden of proof on issues where any other party bears such burdens:

65.    **Estoppel**:  Receiver and the ranchers who allegedly sold cattle to Agridime that were delivered to the Feedyards by or on behalf of Agridime are estopped from asserting senior security interests or other superior claims to such cattle or to the proceeds therefrom on behalf of themselves or other parties due to their actions in failing to perfect superior claims.

66.    **Laches, Delay, and/or Failure to Timely Perfect**:  Receiver and the ranchers who allegedly sold cattle to Agridime that were delivered to the Feedyards by or on behalf of Agridime are estopped from asserting senior security interests or other superior claims to such cattle or to the proceeds therefrom on behalf of themselves or other parties due to their unreasonable delay

and/or delay beyond statutory requirements, including but not limited to the UCC and applicable federal statutory trusts, in failing to perfect superior claims in favor of the ranchers.

67.    **Laches, Delay, and Estoppel by Ranchers**:  The ranchers who allegedly sold cattle to Agridime that were delivered to the Feedyards by or on behalf of Agridime are estopped from asserting senior security interests or other superior claims to such cattle or to the proceeds therefrom on behalf of themselves or other parties due to their failure to contract the Feeders until after the parties' positions had changed, because their complaints were made after the Feedyards had made advances to Agridime.

68.    **Unclean Hands, Negligence, and/or Fraud**:  Receiver and the ranchers who allegedly sold cattle to Agridime that were delivered to the Feedyards by or on behalf of Agridime acted with unclean hands regarding, negligently misrepresented, and/or fraudulently misrepresented (by act and/or disclosure and/or nondisclosure) the ownership of such cattle leading the Feedyards to rely on such representations in accepting the cattle pursuant and extending credit on the cattle and the care and feeding thereof, and therefore may not assert senior security interests or other superior claims to such cattle or to the proceeds therefrom on behalf of themselves or other parties due to their actions.

69.    **Statutory Safe Harbor**:  The cattle in question are not subject to a Dealer Trust Act claim because, pursuant to the safe harbor provided at 7 U.S.C. Section 217b(e)(1), Cattle Empire and Brookover received the cattle in exchange for payment of new value, including financing advanced against the cattle for the cattle and for the feed and care of the cattle, and did so in good faith without notice that such transfer was an alleged breach of trust.

### III.
### COUNTERCLAIMS AND CROSSCLAIMS

70.    The paragraphs above and below are incorporated by reference.

11

71. This case is related to a proceeding before this Court in which Plaintiff Stephen P. Fahey was appointed as receiver for Agridime, LLC. *See SEC v. Agridime*, 4:23-cv-01224-P (the "Receivership").

72. Cattle Empire, LLC is a Kansas limited liability company.

73. Brookover Feed Yards, Inc. is a Kansas corporation with its principal place of business in Kansas.

74. This counter-/crossclaim is brought pursuant to Federal Rule of Civil Procedure 13(a), (b), and (g).

75. This counter-/crossclaim seeks declaratory relief pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. sections 2201 and 2202 for determination of Cattle Empire and Brookover's rights as to the other parties.

**A. Additional Definitions Used in this Counterclaim / Crossclaim Complaint**

76. "Receiver" means Plaintiff/Counter-Defendant Stephen P. Fahey, as Receiver for Agridime, LLC.

77. The "Receivership Case" means related proceeding *SEC v. Agridime LLC et al.*, Civil Action No. 4:23-cv-01224-P, pending in this Court.

78. "North Dakota Ranchers" means Defendants/Cross-Defendants Jaeger, Lenton, and Ost.

79. "Feedyards" mean Defendants/Cross- and Counter-Plaintiffs Cattle Empire and Brookover.

80. "Feedyard-Fed Cattle" means those cattle described in further detail below and identified in this case, specifically those identified by lots N220, 2828, 2855, 2856, 7641, and 7642.

**B. Factual Background**

81. The paragraphs above and below are incorporated by reference.

## 1. Cattle Empire's Relationship with Agridime

82. For several years, Cattle Empire and Agridime did business as follows:

a. Cattle Empire operated a custom feedyard facility in Satanta, Kansas, by which it fed, cared for, and provided financing to customers for feeding and care of cattle. Cattle Empire offered financing to qualified customers for their cattle feeding and financing activities, which included a Loan Agreement, Promissory Note, and filings of UCC-1 Financing Statements. Exhibits A-C.

b. Agridime signed a Promissory Note, Credit & Security Agreement effective January 2, 2022, naming Cattle Empire as payee and secured party. Exhibit A. That security interest was perfected on August 22, 2019, as amended July 20, 2022, Exhibit B, and by Cattle Empire's possession of the cattle placed with it by Agridime.

c. Thereafter, on numerous occasions, Agridime placed cattle for feeding and care with Cattle Empire, and placed those cattle in the feeding and financing program described above. Among other features, this program involved a market evaluation of the cattle placed by Agridime. Cattle would be valued based on reported stocker prices and the Chicago Mercantile Exchange ("CME") board, and Cattle Empire advanced loan proceeds to Agridime for the difference between the cattle value and the equity margin requirements of the loan documents, which required maintenance of a 22% collateral value to total loans outstanding basis. This agreement operated on a rotating basis, pursuant to which cattle were placed, and when they were sold, proceeds were received,

applied to reduce the indebtedness, with reconciliations performed on a monthly basis.

d. Depending on cattle placements, cattle sales, and market prices, funds would be advanced to Agridime, held to satisfy margin requirements, or paid to Agridime.

e. In the Receivership Case (*see* Motion to Lift Stay (Dkt. 63, Cause No. 4:23-cv-01224-P)) the North Dakota Ranchers have asserted claims concerning the following cattle delivered to Cattle Empire for Agridime:  Lots 2855 and 2856 (claimed by Jaeger), Lot 2828 (claimed by Ost), and Lot N220 (claimed by Lenton).

f. Agridime represented to Cattle Empire that it was the owner of the cattle in the lots at issue in this case, including Lots N220 (received at Cattle Empire Nov. 10, 2023), 2828 (Nov. 17, 2023), 2855, and 2856 (each received Dec. 7, 2023). Specifically, it represented that "[Agridime] has or will have at the time of acquisition good and marketable title to the Collateral, subject to no lien, claim, mortgage, or other encumbrance, except as disclosed herein."  Further, the North Dakota Ranchers' behavior in releasing possession of the Cattle to Agridime under a contract of sale was inconsistent with that of a party who is allegedly "retaining" an ownership interest.  They loaded the cattle on trucks, participating in shipping them to Agridime's selected location (Cattle Empire) for feeding and care, and made no attempt to contact Cattle Empire to assert their interest even though they knew where the cattle were going.  As a result,

14

Cattle Empire had no reason to believe and did not believe that the cattle were subject to any purported "retained ownership" agreements.

g. Agridime sought advances from Cattle Empire on a pre-existing line of credit. Cattle  Empire made such advances on November 10, 2023 (Lot no. N220) ($182,983.94), November 17, 2023 (Lot no. 2828) ($182,500.03), and December 7, 2023 (Lots no. 2855 and 2856) ($166,598.64 and $179,459.28).

h. The initial advances were made pursuant to a Promissory Note, Credit & Security Agreement, by which Agridime granted a security interest in the cattle in question.  *See* Exhibits A, C.  Later advances for feeding and care costs were made pursuant to the same documents.

**2. Brookover's Relationship with Agridime**

83.    Brookover and Agridime did business in the following manner:

a. Brookover operated a custom feedyard facility in Garden City, Kansas, by which it fed, cared for, and provided financing to customers for feeding and care of cattle.  Brookover offered financing to qualified customers for their cattle feeding and financing activities, which included Promissory Notes for each lot of cattle placed for feeding and financing, a Security Agreement, a Feeding Agreement, and filings of UCC-1 Financing Statements.  Exhibits D-H.

b. On or about August 23, 2023, Agridime signed a Security Agreement and a Feeding Agreement naming Brookover as Feeder and secured party.  True copies of these instruments are found at Exhibit D and Exhibit E.  That security interest was perfected by filing on August 24, 2023, and March 20, 2024, as

15

shown by Exhibit F, and by Brookover's possession of the cattle placed with it by Agridime.

c.  Thereafter, on several occasions, Agridime placed cattle for feeding and care with Brookover, and placed those cattle in the feeding and financing program described above.  As of the date of the Receivership, several lots of cattle, including the disputed Lots no. 7641 and 7642 (received at Brookover Dec. 4, 2023), were located at the Brookover yard.  Agridime signed a Promissory Note for each lot.  Copies of each note are found at Exhibit G and Exhibit H.  The stated amount of each note was based on a market evaluation of the cattle placed by Agridime and on estimated feeding and care costs, but the amount could vary to be "such amount as shall actually be advanced."

d.  Depending on cattle placements, cattle sales, and market prices, funds would be advanced to Agridime, held to satisfy margin requirements, or paid to Agridime.

e.  In the Receivership Case (*see* Motion to Lift Stay (Dkt. 63, Cause No. 4:23-cv-01224-P)), Jaeger has asserted claims regarding cattle he shipped to Brookover on behalf of Agridime in Lot 7641 and 7642.

f.  Agridime represented to Brookover that it was the owner of the cattle in Lots 7641 and 7642.  It further represented that "[Agridime] has[,] or from the proceeds of the indebtedness secured hereby will acquire, absolute title to the goods free and clear of all liens, encumbrances and security interests except the security interest hereby granted to [Brookover] . . . ." and that "[Agridime] has legal title to the cattle and there are no liens, encumbrances, security interests,

16

and agreements encumbering such cattle other those in favor of [Brookover] or filed by Brookover Financial Services, Inc." Further, Jaeger's behavior in releasing possession of the Cattle to Agridime under a contract of sale was inconsistent with that of a party who is allegedly "retaining" an ownership interest. Jaeger loaded the cattle on trucks, participating in shipping them to Agridime's selected location (Brookover) for feeding and care. Jaeger made no attempt to contact Brookover to assert an interest despite knowing where the cattle were going. As a result, Brookover had no reason to believe that the cattle were subject to any "retained ownership" agreement.

g. Agridime sought an advance from Brookover as to Lots 7641 and 7642. Brookover made such an advance in the amount of $160,483.94 on December 6, 2023 (Lot 7641) and in the amount of $156,934.81 on December 6, 2023 (Lot 7642).

h. Brookover's security interest was perfected by filing a UCC-1 financing statement with the Texas Secretary of State. Exhibit F.

### 3. Shipment of Agridime Cattle to Feedyards by North Dakota Ranchers on behalf of Agridime.

84.     In each case, the North Dakota Ranchers released possession of the Cattle to Agridime under a contract of sale. They participate in loading the cattle on trucks, participating in shipping them to Agridime's selected location (the Feedyards) for feeding and care, Such third parties Triple J Farms and Gary Engstrom Trucking delivered the cattle to the Feedyards.

85.     The Feedyard-Fed Cattle were delivered with documentation showing Agridime as the purchaser and veterinary inspection certificates reflecting Agridme as "consignee, new owner"

17

of the cattle.  The North Dakota Ranchers effected the inspections that resulted in such veterinary inspection certificates.

### 4. Activity During the Pendency of the receivership

86.    When the Receivership was created, Cattle Empire and Brookover were in possession of cattle placed by Agridime for feeding and care pursuant to written agreements, including promissory notes and security agreements.

87.    In the Receivership Case, this Court ordered that:

- The feed to finish and sales of the Feed Lot Cattle and Disputed Feed Lot Cattle continue to occur in accordance with ordinary industry standards;

- all sales proceeds from the sale of Feed Lot Cattle that are not Disputed Feed Lot Cattle shall be turned over and dispersed to the Receiver within two (2) business days of the selling party's receipt of such proceeds ("Feed Lot Cattle Proceeds"); provided the selling party may retain from the Feed Lot Cattle Proceeds the cost of feed and care and associated feed and care financing for such cattle, and may also retain the outstanding amounts owed on any financing for the particular lot of cattle sold (the "Feed Lot Cattle Financing Amount"); provided further, if any third party asserts a claim against particular Feed Lot Cattle or the Feed Lot Cattle Proceeds, then, within two (2) business days of receipt of such claim, the selling party shall turnover and disperse to the Receiver the associated Feed Lot Cattle Financing Amount; and

- Cattle Empire, Brookover Feed Yards, Beef City, or any similarly situated feed lot is PREVENTED from asserting a default or exercising any remedies, including any form of self-help in violation of the Court's Order Appointing Receiver ([4:23-cv-01224-P] ECF No. 15), based on competing claims.

4:23-cv-01224-P Dkt. 98 at 1-2; *see also id.* Dkt. 95.

88.    All Feedyard-Fed Cattle were finished and sold by summer 2024.  The Feedyards turned over the Feedyard-Fed Cattle proceeds to the Receiver as ordered by the Court, retaining only the cost of feed and care and the financing costs specifically associated with feed and care costs as ordered.

89.     The amounts paid by the Feedyards pursuant to the Court's orders were:

Cattle Empire

| Lot | Associated Rancher | Amount | Date of Payment to Receiver |
|---|---|---|---|
| 2855 | Jaeger | $173,503.91 | 5-24-24 |
| 2856 | Jaeger | 287,401.98<br>5,032.06 | 5-21-24<br>6-6-24 |
| 2828 | Ost | 236,120.29 | 4-4-24 |
| N220 | Lenton | 283,054.69 | 3-29-24 |
| **Total** | | **$1,088,552.78** | |

Brookover

| Lot | Associated Rancher | Amount | Date of Payment |
|---|---|---|---|
| 7641 | Jaeger | $257,754.29 | 5-7-24 |
| 7642 | Jaeger | 257,422.25 | 5-7-24 |
| **Total** | | **$515,176.54** | |

90.     These sums continue to accrue interest pursuant to the loan agreements identified above.

91.     Without admitting to the validity of their claims, the Feedyards acknowledge that in the Receivership Case, the North Dakota Ranchers asserted priority interest in the proceeds for the Feedyard-Fed Cattle pursuant to purported "retained ownership" agreements they allege to have entered with Agridime.  *See* 4:23-cv-01224-P at Dkts. 63/64, 173/174, 215/216.

92.     Likewise without admitting to the validity of any such claims, the Feedyards acknowledge that additional parties may seek to assert competing priority claims to such proceeds as well, and that the Receiver has joined such parties in this litigation.  *See generally* Dkt. 1.

93.     The Feedyards now seek this Court's adjudication of the relative priority of claims to the proceeds from the Feedyard-Fed Cattle, including the financing costs and accrued interest for the cattle.

**C. Counterclaim and Crossclaim Count 1:   For Declaratory Relief Regarding Relative Priority of Feedyards' Secured Interest in Proceeds from Sale of Feedyard-Fed Cattle Pursuant to UCC**

94.     The paragraphs above and below are incorporated by reference.

**1.   Feedyards Performed their Agreements with Agridime and are Entitled to Payment under the Agreements, including Financing Costs and Accrued Interest from the Proceeds**

95.     As discussed above, the Feedyards financed the cattle and fed the cattle to finish in accordance with the agreements between the Feedyards and Agridime.  As a result, Agridime is entitled to the proceeds from sale of the cattle to the extent of feed and care costs and feed and care financing costs, which the Feedyards have retained pursuant to the Court's orders, as well as the financing costs and interest, which the Feedyards have disbursed to the Receiver pursuant to the Court's orders.

**2.   Feedyards Obtained Perfected Security Interests over the Proceeds Pursuant to UCC.**

96.     The Feedyards' security interests were created by written security agreements signed by Agridime and perfected with UCC-1 financing statements.  This means that the Feedyards have an enforceable secured interest in the proceeds as to the debtor (Agridime) and as to any alleged unpaid sellers, including the North Dakota Ranchers.

97.     UCC Section 9.102(a)(74) defines a security agreement as "an agreement that creates or provides for a security interest."  The Feedyards' agreements do create or provide for a security interest.

98.     Section 9.203 provides that "[a] security interest attaches to collateral when it becomes enforceable against the debtor . . . ," and that a security interest in collateral "is enforceable against the debtor and third parties" if three conditions are met:

(1) value has been given;

20

(2) the debtor has rights in the collateral or the power to transfer rights in the collateral . . . and

(3) one of the following conditions is met:

    (A) the debtor has authenticated a security agreement that provides a description of the collateral.

99.    All of these conditions are met in this case. The Feedyards gave value by advancing loan proceeds to Agridime. Agridime signed a security agreement that granted the Feedyards a security interest in the cattle. And Agridime had "rights in the collateral" because it was a buyer of the cattle under agreements to purchase with the North Dakota Ranchers, assumed the risk of ownership of the cattle in those agreements, and exercised control over the cattle by directing their feed and care while at the Feedyards' facilities.

100.    Agridime's rights in the cattle at the time were identical to the factors identified by the *Kunkel* court as satisfying Section 9.203's "rights in collateral" element:

> "An agreement to purchase can give rise to sufficient rights in the debtor to allow a security interest to attach, regardless of whether the debtor has technically obtained title to the property." *United States v. Ables*, 739 F. Supp. 1439, 1444 (D. Kan. 1990). Courts consider factors such as the extent of the debtor's control over the property and whether the debtor bears the risk of ownership. *See, e.g., Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank*, 705 F.2d 396, 399 (10th Cir. 1983) (debtor's control); *Chambersburg Trust Co. v. Eichelberger*, 403 Pa. Super. 199, 588 A.2d 549, 552-53 (Pa. Super. Ct. 1991) (debtor had risk of ownership). The debtor need not have possession in order to pledge the property; the UCC expressly contemplates that the secured party may retain possession of the collateral. *See* Kan. Stat. Ann. § 84-9-305.

*Kunkel*, 128 F.3d at 641.

101.    The rights of an unpaid cattle seller are subject to and inferior to a secured lender to the defaulting buyer. *See e.g. Samuels & Co.*, 526 F.2d 1238 (unpaid cattle seller's interest inferior to interest of defaulting buyer's lender); *O'Brien v. Chandler*, 765 P.2d 1165 (N.M. 1988) (same); *Maryott v. Oconto Cattle Co.*, 607 N.W.2d 820 (Neb. 2000) (same); *Bank of Beaver City v. Barretts' Livestock, Inc.*, 295 P.3d 1088 (Okla. 2012) (same); *Fricke*

21

*v. Valley Prod. Credit Asso.*, 721 S.W.2d 747 (Mo. Ct. App. 1986) (same); ); *First Nat'l Bank v. Smoker*, 286 N.E.2d 203, 208-09 (Ind. App. 1972) (same).  The North Dakota Ranchers' claims therefore fail under established principles set out in the Uniform Commercial Code.

102.    The North Dakota Ranchers' purported "retained ownership agreements" did not preserve any interests sufficient to defeat the attachment of the Feedyards' rights to the collateral.  *See Cont'l Grain Co. v. Brandenburg*, 587 N.W.2d 196 (S.D. 1996) ("Even if a party retains ownership interest in a piece of collateral, a debtor who retains that collateral is still able to mislead potential creditors by exercising his 'rights' of possession and control over the collateral.  It is the outward appearance of a debtor's rights of ownership and control in the collateral that determines whether attachment of a security interest is effective and not the right of a party who may have title to the collateral") (citations omitted).  This is precisely what happened here—the North Dakota Ranchers allowed Agridime to mislead the Feedyards by giving Agridime the appearance of ownership and control of cattle they claim they owned, regardless of the reality of ownership.

### 3. Any North Dakota Ranchers' priority interest terminated on delivery pursuant to the UCC.

103.    Section 2.401 of the Uniform Commercial Code establishes that the rights and remedies of purchasers, sellers, and third parties established in Article 2 apply "irrespective of title to the goods, except where the provision refers to such title."

104.    Section 2.401(a) applies directly to the North Dakota Ranchers' claims of priority interest in the proceeds from the Feedyard-Fed Cattle.  It says:  "Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest."  Section 2.401(b) says:  "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes

his performance with reference to the physical delivery of the goods, despite any reservation of a security interest, and even though a document of title is to be delivered at a different time or place…."

105.    The UCC defeats the "retained title" argument advanced by the North Dakota Ranchers.  Thus, if a seller has not obtained a security agreement that complies with Article 9, the seller's interest in the goods terminates on delivery.

106.    The North Dakota Ranchers did not obtain a security agreement from Agridime or perfect a security interest pursuant to Article 9.  Therefore, their interest terminated on delivery to Agridime, which occurred when the cattle arrived at the Feedyards, and at that time they became unsecured creditors.

### 4. UCC Article 2 shelter rules protect Cattle Empire's and Brookover's security interests over any interest claimed by the North Dakota Ranchers.

107.    UCC Section 2.403 contains many of the UCC's "shelter" rules that protect downstream parties.  It protects parties according to their status under the Code classifications.  Persons who qualify as "good faith purchasers" are permitted to take good title from one with "voidable" title.

108.    Courts have applied the shelter rules in common fact patterns that arise in cattle marketing disputes.  For example, a lender to an insolvent middleman may be a "good-faith purchaser for value" and enforce its security interest against an unpaid seller.  *See, e.g.*, *Rufenacht v. Iowa Beef Processors, Inc.*, 656 F.2d 198 (5th Cir. 1981), *cert. denied*, 455 U.S. 921, 102 S. Ct. 1279, 71 L. Ed. 2d 462 (1982); *Continental Grain Co. v. Heritage Bank*, 548 N.W.2d 507 (S.D. 1996).

109.    Most directly applicable, in *Matter of Samuels, & Co., Inc.*, 526 F.2d 1238, 1248 (5th Cir. 1976) (*en banc*), the Fifth Circuit held that an unpaid seller's claim to his packer-buyer's

23

livestock and proceeds was subordinate to the lender's perfected security interest based on the UCC. Specifically, the lender with the perfected security interest under Article 9 qualified as a good faith purchaser for value, and therefore had priority over the seller. *Id.* at 1247. The lender's security interest attached as a result of the seller's voluntary act of delivery of the cattle to the buyer without reserving a written security interest. *Id.* at 1247.

110. Even if North Dakota Ranchers ever had any security interest—which the Feedyards dispute—they failed to perfect any interest and are therefore inferior claimants to the Feedyards' perfected interests. As the *Samuels* court notes, Article 9 provides a means for seller to perfect a prior security interest upon ceding possession of the collateral, but failure of a seller to do so renders the seller unable to defeat a perfected secured party's priority. *See id.*; *Kunkel v. Sprague Nat'l Bank*, 128 F.3d 636 (8th Cir. 1997) (in a cattle case, discussing the requirement that a purchase money security interest must be perfected "at the time the debtor receives possession of the inventory," among other requirements, in order to assert priority over other security interests); *see also, e.g.*, UCC §§ 9.301 et seq. (perfection and priority); § 9.110 (providing that a security interest pursuant to Article 2 or 2A is subject to Article 9 once the "debtor obtains possession of the goods"). Though the North Dakota Ranchers claim to have a retained ownership interest rather than a purchase-money sellers' interest, as discussed further below, such claims likewise failed to establish attachment or perfection of any security interest in the cattle, and therefore any interest that they claim is necessarily inferior to a perfected interest.

**5. The North Dakota Ranchers' claims under the Dealer Trust Act are subordinate to the security interests of Cattle Empire and Brookover.**

111. The North Dakota Ranchers have asserted that their interests in sales proceeds in excess of feeding and care costs, and related financing costs, are protected by the Dealer Trust Act, 7 U.S.C. § 217b.

24

112.    The Dealer Trust Act says: "(1) In general.  All livestock purchased by a dealer in cash sales and all inventories of, or receivables or proceeds from, such livestock shall be held by such dealer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid cash sellers."  7 U.S.C. § 217b (a)(1).  A "dealer" is defined by 7 U.S.C. § 201 as "any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser."

113.    As an initial matter, the North Dakota Ranchers are unlikely able to prove that they were cash sellers or otherwise qualify for protection under the Dealer Trust Act.  They likewise cannot prove that they perfected their trust interest as required by the statute.

114.    Furthermore, even if the North Dakota Ranchers were cash sellers, a safe harbor in the Act discussed below preserves the Feedyards' priority claims over those of the North Dakota Ranchers.

115.    To perfect a claim under the Dealer Trust Act a seller must give written notice to the dealer and file the notice of non-payment with the Secretary of Agriculture ''(1) within 30 days of the final date for making a payment under section 409 [7 U.S.C. § 228b, the "Prompt Payment" statute] in the event that a payment instrument has not been received; or (2) within 15 business days after the date on which the seller receives notice that the payment instrument promptly presented for payment has been dishonored.  7 U.S.C. Section 228b says:  "Each packer, market agency, or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and transfer of possession thereof, deliver to the seller or his duly authorized representative the full amount of the purchase price."  The North Dakota Ranchers did do not have valid statutory trust claims, and did not perfect any claims they may have, but even if

they had, Cattle Empire and Brookover are entitled to prevail because of the safe harbor for lenders created by the Act.  7 U.S.C. Section 217b provides:

> (e) Purchase of livestock subject to trust—
>
>> (1)    In general.  A person purchasing livestock subject to a dealer trust shall receive good title to the livestock if the person receives the livestock—
>>
>>> (A)    in exchange for payment of new value; and
>>>
>>> (B)    in good faith without notice that the transfer is a breach of trust.

116.    This statute has not been interpreted by published case law, but cases under the sister statute, the Packers and Stockyards Act, 1921, 7 U.S.C. §§ 181-229c ("PSA"), have long held that third party lenders who make loans without knowledge of the alleged breach of the trust created by the statute are not subject to the trust:

> The court is persuaded by the cases relied upon by Farm Credit that the Packers and Stockyards Act does not authorize the tracing of trust funds to third party payees who have no actual or constructive notice of the character of the funds received and who received the funds as payment for antecedent debts for services or goods. *See In re Tanner*, 77 Bankr. 897 (Bkrtcy. N.D. Ala. 1987); *Lyng v. JDC Enterprises*, 117 Bankr. 268 (S.D. Tex. 1990); *C.H. Robinson Co. v. B.H. Produce Co., Inc.*, 723 F.Supp. 785 (N.D. Ga. 1989); *compare In re Gotham Provision Co., Inc.*, 669 F.2d 1000 (5th Cir.), *cert. denied*, 459 U.S. 858 (1982); *Liberty Mutual Ins. Co. v. Bankers Trust Co.* 758 F. Supp. 890 (S.D.N.Y. 1991); *In re G & L Packing Co., Inc.*, 20 Bankr. 789 (Bkrtcy. N.D.N.Y. 1982)."

*In re Roxford Foods Litig.*, 1992 U.S. Dist. LEXIS 12359, at *9 (E.D. Cal. Feb. 28, 1992).

117.    Under the UCC, the terms "purchase" and "good faith" are defined, and these state law definitions protect Cattle Empire and Brookover.  "Purchase" is defined by UCC § 1.201(b)(29) to mean "taking by sale … lien, security interest ... or any other voluntary transaction creating an interest in property."  Good faith" is defined by UCC § 1.201(b)(20): "Good faith," except as otherwise provided in Chapter 5 [letters of credit], means honesty in fact and the observance of reasonable commercial standards of fair dealing."  *Samuels & Co.*, 526 F.2d 1238,

26

1243-44 (the UCC's "definition of an Article Two good faith purchaser does not expressly or impliedly include lack of knowledge of third-party claims as an element."). The Feedyards did not have knowledge of the alleged breach of trust.

118. Therefore, even if North Dakota Ranchers had statutory trust claims, the safe harbor protection of the Dealer Trust Act applies, and the court should determine that the North Dakota Ranchers' claims are inferior to the secured interests of the Feedyards.

119. The Feedyards, therefore, ask the Court to enter a declaration that the Feedyards' rights and interests in the Feedyard-Fed Cattle and the proceeds therefrom are secured and superior to that of the Receivership and the North Dakota Ranchers and other parties. Such declaration in favor of the Feedyards should include a priority secured interest in the proceeds from the Feedyard-Fed Cattle for payment of the care and feed costs of the cattle, the financing costs for the care and feed of the cattle, and the financing costs for the cattle, including all accrued interest to date. The Court should further declare that, being superior, the Feedyards' claims are ripe for payment at this time to the Feedyards for their financing costs from the proceeds for the Feedyard-Fed Cattle.

### D. Crossclaim Count 2: For Declaratory Relief that North Dakota Ranchers are Estopped from Claiming Superior Interest in Feedyard-Fed Cattle

120. The paragraphs above and below are incorporated by reference.

121. Pleading in the alternative to the extent necessary, even if this Court would otherwise determine that the North Dakota Ranchers may hold a superior security interest or other priority in the Feedyard-Fed Cattle or their proceeds over such claims of the Feedyards at law, the Court should declare that the North Dakota Ranchers are estopped from such priority and that the superior rights belong to the Feedyards.

122. In cases where possession of collateral does not create sufficient rights in the collateral for a security interest to attach, the necessary rights, may be created by means of

estoppel.  If the owner of collateral allows another to appear as the owner or to dispose of the collateral, such that a third party is led into dealing with the apparent owner as though he were the actual owner, then the owner will be estopped from asserting that the apparent owner did not have rights in the collateral.  *Pleasantview Farms, Inc v. Ness*, 455 N.W.2d 602 (S.D. 1990) (citing *In re Pubs, Inc.*, 618 F.2d 432 (7th Cir 1980)) (emphasis added).  Where a creditor has been misled by an apparent ownership, and has given credit on the faith of such ownership, security interest attaches.  *Estate of Harris v. Harris*, 218 F3d 1140 (10th Cir. 2000).

123.    The North Dakota Ranchers voluntarily released possession of the Cattle to Agridime under a contract of sale. They loaded the cattle on trucks, participating in shipping them to Agridime's selected location (the Feedyards) for feeding and care through third parties.  Those third parties, including Triple J Farms and Gary Engstrom Trucking, delivered the cattle.  The Feedyard-Fed Cattle were shipped and delivered with documentation showing Agridime as the purchaser and veterinary inspection certificates reflecting Agridime as "consignee, new owner" of the cattle.  The North Dakota Ranchers effected the inspections that resulted in such veterinary inspection certificates.

124.    The North Dakota Ranchers knew the cattle were being delivered to the Feedyards on Agridime's behalf for care and feeding.  Despite knowing the location of the cattle, the North Dakota Ranchers permitted Agridime to act as the sole point of contact with the Feedyards, exercising control over the cattle by directing their feed and care while at Feedyards' facilities.  The North Dakota Ranchers further knew that such control was typical of the owner of such cattle.

125.    The North Dakota Ranchers know it is typical practice in the cattle business for feed and care facilities such as the Feedyards to extend credit to cattle owners for the feed and care

28

costs incurred for the cattle placed in their facilities and often to extend credit for the cattle themselves. The North Dakota Ranchers know it is generally necessary for cattle owners to obtain such financing from feed and care facilities in order to finance the feed and care of cattle until they can be sold. The North Dakota Ranchers know it is typical practice in the cattle business for feed and care facilities such as the Feedyards to take and perfect security interests in such cattle pursuant to the issuance of credit discussed above. The North Dakota Ranchers know that feed and care facilities such as the Feedyards rely on the ownership of cattle by its customers in extending such credit and taking and perfecting such security interests. The North Dakota Ranchers know that feed and care facilities such as the Feedyards will not generally issue unsecured credit of the sort described above.

126. The North Dakota Ranchers allowed Agridime to appear as the owner by shipping the cattle to Cattle Empire and Brookover with no indication of their alleged retained ownership claims. Their affidavits all provide: "Said another way, my understanding is that even though possession of the cattle may be with [Cattle Empire/Brookover], the ultimate ownership of the cattle remains with me until payment is tendered to me." But the *North Dakota Ranchers'* "understanding" is not determinative. By delivering the cattle to Agridime under a contract of sale, participating in shipping the cattle, delivering possession and control of the cattle to Agridime, and failing to assert a claim, they allowed Agridime to appear to be the owner and Cattle Empire and Brookover to rely on Agridime's apparent ownership. As a result, they are estopped from attempting to undo the results of their decision. *See Estate of Harris v. Harris*, 218 F3d 1140 (10th Cir. 2000) (where a creditor "has been misled by an apparent ownership, and has given credit on the faith of such ownership," security interest attaches).

127.    Therefore, the Court should declare that the North Dakota Ranchers are estopped from claiming a superior priority interest ahead of the secured interest of the Feedyards.  Such declaration in favor of the Feedyards should include a priority secured interest in the proceeds from the Feedyard-Fed Cattle for payment of the care and feed costs of the cattle, the financing costs for the care and feed of the cattle, and the financing costs for the cattle, including all accrued interest to date.  The Court should further declare that, because the North Dakota Ranchers are estopped, the Feedyards' claims are ripe for payment at this time to the Feedyards for their financing costs from the proceeds for the Feedyard-Fed Cattle.

**E.  Counterclaim and Crossclaim Count 3:  Marshaling (Receiver and All Other Defendants)**

128.    The paragraphs above and below are incorporated by reference.

129.    This Count is pleaded as a counterclaim against the Receiver and a Cross-Claim against the North Dakota Ranchers and any other Defendant claiming a priority interest in the proceeds from the Feedyard-Fed Cattle.

130.    Pleading in the alternative to the extent necessary, to the extent that the Court determines North Dakota Ranchers' claim to the proceeds is superior to that of the Feedyards, the Court should order marshaling of other cattle- and meat-derived proceeds held by the Receiver for payment of the North Dakota Ranchers' priority interest so as to preserve the Feedyard-Fed Cattle proceeds for payment of the Feedyards.

131.    "The equitable doctrine of marshaling 'rests upon the principle that a creditor having two funds to satisfy his debt, may not by his application of them to his demand, defeat another creditor, who may resort to only one of the funds.'"  *In re Talmo*, 192 B.R. 272, 274-75 (Bankr. S.D. Fla. 1996) (*quoting Meyer v. United States*, 375 U.S. 233, 236 (1963); *All American Holding Corp. v. Elgin State Bank*, 17 B.R. 926, 928 (S.D. Fla. 1982)); *see also Wynnewood Bank*

& Tr. v. State, 767 S.W.2d 491, 498 (Tex. App.—Dallas 1989, no writ) ("That doctrine requires a mortgagee to proceed against parcels of mortgaged property in that order which minimizes harm to subsequent grantees or lien holders.").

132.   The Dealer Trust Act—under which the North Dakota Ranchers and potentially other Defendants assert claims—provides that "[a]ll livestock purchased by a dealer in cash sales and all inventories of, or receivables or proceeds from, such livestock shall be held by such dealer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid cash sellers."  The Act is based on federal statutes that create trusts which are generally interpreted by courts as precluding any tracing requirement by the claimant of its particular assets in order to participate in a trust recovery.  *In re Gotham Provision Co.*, 669 F.2d 1000, 1010 (5th Cir. 1982) ("the bankruptcy court was correct in rejecting the Bank's argument that specific tracing is required to establish that accounts receivable are subject to a § 206 [Packers and Stockyards Act Packers'] trust. . . .  Congress did not intend that livestock producers perform the almost impossible task of tracing their products into specific receivables.").  *See also Sanzone-Palmisano Co. v. M. Seaman Enters., Inc.*, 986 F.2d 1010, 1012 (6th Cir. 1993) (holding that a Perishable Agricultural Commodities Act floating trust applies to all of a debtor's Produce-related inventory and proceeds thereof, regardless of whether the trust beneficiary or another Produce supplier was the source of such inventory); *Tom Lange Co. v. Kornblum & Co. (In re Kornblum & Co.)*, 81 F. 3d 280, 284 (2d Cir. 1996) (same); *Six L's Packing Co. v. W. Des Moines State Bank*, 967 F.2d 256, 258 (8th Cir. 1992) ("the burden is on the PACA debtor . . . to show that the disputed payment is from a non-trust source").  Further, for agricultural businesses, like Agridime, all of their income is from the sale of such products, so theoretically all their assets could be considered trust assets.  *See, e.g.*, *Six L's Packing*, 967 F.2d at 258 (where debtor demonstrated twenty-five

percent of income was from non-trust sources, trial court's holding that seventy-five percent of debtor's assets were trust assets was upheld).

133.    The Receiver's March 31, 2024, Quarterly Report reported substantial assets on hand that are described as meat products or proceeds that were not derived from the Feedyard-Fed Cattle or subject to the Dealer Trust Act claims asserted by the North Dakota Ranchers. Subsequent reports describe significant assets from meat sales and remaining meat inventory anticipated to be sold in the near future.  Such reports likewise identify clawback claims in excess of $15 million.  These assets could be marshalled to pay any valid Dealer Trust Claims, and freeing the proceeds from the Feedyard-Fed Cattle to be dedicated to the satisfaction of the Feedyards' claims separately.

134.    Applying marshaling to this case would mean that the North Dakota Ranchers and other claimants could recover their any perfected dealer trust claims, from dealer trust assets of the Receiver other than the proceeds from the Feedyard-Fed Cattle, and thus the proceeds from the Feedyard-Fed Cattle remain available to be paid to the Feedyards in satisfaction of their secured interests.

135.    Therefore, should the Court find that the North Dakota Ranchers have priority claims over those of the Feedyards, the Court should declare that the relative rights of the parties require the Receiver to marshal cattle- and meat-derived funds other than the proceeds of Feedyard-Fed Cattle for the purpose of paying the North Dakota Ranchers before invading such proceeds, so as to preserve as much of the proceeds as possible for payment of the Feedyards.

### F. Crossclaim Count 4:  Fraud and/or Fraudulent Nondisclosure/Silence[1] (North Dakota Ranchers)

---

[1] Feedyards note that the cause of action Texas courts recognize as "fraud by nondisclosure," Kansas courts call "fraud by silence."  *Cf. Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) (fraud by nondisclosure) with *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman*, 978 P.2d 922, 932 (Kan. 1999) (fraud by silence)

136.    The paragraphs above and below are incorporated by reference.

137.    Pleading in the alternative to the extent necessary, the Feedyards have been harmed by the fraud and/or fraud by nondisclosure or silence of the North Dakota Ranchers.

138.    The Feedyard-Fed Cattle were delivered to the Feedyards in the lots and on the dates set forth above.

139.    The North Dakota Ranchers loaded the cattle on trucks, participating in shipping them to Agridime's selected location (the Feedyards) for feeding and care through third parties, including Triple J Farms and Gary Engstrom Trucking.

140.    The Feedyard-Fed Cattle were delivered with documentation showing Agridime as the purchaser and veterinary inspection certificates reflecting Agridime as "consignee, new owner" of the cattle.

141.    The North Dakota Ranchers effected the inspections that resulted in such veterinary inspection certificates.

142.    The North Dakota Ranchers knew the cattle were being delivered to the Feedyards for care and feeding.

143.    Despite knowing the location of the cattle, the North Dakota Ranchers permitted Agridime to act as the sole point of contact with the Feedyards, exercising control over the cattle by directing their feed and care while at Feedyards' facilities.  The North Dakota Ranchers further knew that such control was typical of the owner of such cattle.

144.    The North Dakota Ranchers know it is typical practice in the cattle business for feed and care facilities such as the Feedyards to extend credit to cattle owners for the feed and care costs incurred for the cattle placed in their facilities and often to extend credit for the cattle themselves.

145.    The North Dakota Ranchers know it is generally necessary for cattle owners to obtain such financing from feed and care facilities in order to finance the feed and care of cattle until they can be sold.

146.    The North Dakota Ranchers know it is typical practice in the cattle business for feed and care facilities such as the Feedyards to take and perfect security interests in such cattle pursuant to the issuance of credit discussed above.

147.    The North Dakota Ranchers know that feed and care facilities such as the Feedyards rely on the ownership of cattle by its customers in extending such credit and taking and perfecting such security interests.

148.    The North Dakota Ranchers know that feed and care facilities such as the Feedyards will not generally issue unsecured credit of the sort described above.

149.    The North Dakota Ranchers know that feed and care facilities such as the Feedyards have limited capacity for the feed and care of livestock and that accepting certain livestock can mean the turning away of other livestock.

150.    The North Dakota Ranchers caused the cattle to be shipped to the Feedyards with documentation described above, cognizant that the Feedyards would be extending credit and taking and perfecting security interests in the cattle, and aware that the Feedyards believed Agridime to be the owner of the cattle due to the North Dakota Ranchers' actions and documentary representations described above, without disclosing to the Feedyards that the North Dakota Ranchers purported to own the cattle under alleged "retained ownership" agreements with Agridime.  In so doing, the North Dakota Ranchers made partial representations that created substantially false impressions regarding the ownership of the cattle.  Specifically, they disclosed some facts—including that they were selling the cattle to Agridime, that they were shipping the

34

cattle to the Feedyards on behalf of Agridime, that Agridime was the "new owner," that Agridime now controlled the cattle—while concealing their purported retained ownership. The Feedyards were ignorant of any such purported retained ownership and did not have equal opportunity to discover the facts of alleged agreements to which they were not a party.

151. The North Dakota Ranchers knew that if they had disclosed a retained ownership over the Feedyard-Fed Cattle to the Feedyards, the Feedyards would not have extended credit to Agridime for the cattle or for their feed and care absent additional arrangements, such as credit and security agreements with the North Dakota Ranchers, releases from the North Dakota Ranchers, or turning the cattle away in favor of other customers who owned their cattle. The result would be that Agridime would be unable to purchase cattle from the North Dakota Ranchers. Therefore, the North Dakota Ranchers, while shipping cattle to the Feedyards, remained deliberately silent as to the purported retained ownership of the Feedyard-Fed Cattle, when they should have disclosed any such arrangement.

152. The Feedyards relied on the representations and non-disclosures of the North Dakota Ranchers to their detriment in accepting the cattle. Specifically, if this Court were to determine that the North Dakota Ranchers had a superior interest, depleting the proceeds in which the Feedyards have a secured interest, the Feedyards would be damaged by the amount by which the proceeds are depleted, up to the amount of their security interest in same. Additionally, and/or alternatively, the Feedyards are damaged by the amount of lost profits that would have been available to the Feedyards from other customers, had the North Dakota Ranchers fully disclosed the alleged ownership arrangement.

## IV.
## RESERVATION OF RIGHTS IN UNSECURED OR OTHERWISE NON-PREFERENTIAL CLAIMS.

153. The paragraphs above and below are incorporated by reference.

154. Receiver's complaint was filed to "seek[] a declaration from this Court regarding what preference, if any, should be given to the Ranchers and Feedyards regarding their respective claims to certain proceeds currently held by the receiver." Dkt. 1 ¶ 1.

155. The Feedyards' Counter-/Crossclaims asserted above likewise relate to the Feedyards' secured or otherwise preferential claims against Agridime.

156. To the extent the Court determines the Feedyards have claims against Agridime, LLC that are not entitled to preference or that, though entitled to preference cannot be satisfied by proceeds held by the Receiver that are subject to such preferential claims in this proceeding, the Feedyards do not waive such claims by this pleading, but rather reserve such claims for collection in the Receivership case.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Cattle Empire, LLC and Brookover Feed Yards, Inc. respectfully pray for judgment for:

a. Declaration that the Feedyards' rights and interests in the Feedyard-Fed Cattle and the proceeds therefrom are secured and superior to that of the Receivership and the North Dakota Ranchers and other parties for payment of the care and feed costs of the cattle, the financing costs for the care and feed of the cattle, and the financing costs for the cattle, including all accrued interest to date;

b. Declaration that the North Dakota Ranchers are estopped from asserting any priority claim, whether a secured interest or trust claim, that is superior to the Feedyards' secured interests;

c. Declaration that any interest of the North Dakota Ranchers be paid first out of marshaled funds of the Receivership other than the proceeds of the Feedyard-Fed Cattle;

36

d.  Declaration that the Feedyards' secured interests are ripe for payment from from the proceeds for the Feedyard-Fed Cattle;

e.  Against the North Dakota Ranchers for fraud, fraudulent misrepresentation, and/or fraud by nondisclosure/silence;

f.  Reasonable attorney's fees;

g.  Costs of suit;

h.  All other relief the Court deems appropriate.

Respectfully submitted,

By:     */s/ David L. LeBas*
        David L. LeBas

David L. LeBas, State Bar No. 12098600
dlebas@namanhowell.com
Michael Duncan, State Bar No. 24097628
mduncan@namanhowell.com
**NAMAN HOWELL SMITH & LEE, PLLC**
8310 N. Capital of Texas Hwy., Ste. 490
Austin, Texas 78731
(512) 479-0300; FAX (512) 474-1901

Jackie Robinson, State Bar No. 17092250
jrobinson@namanhowell.com
**NAMAN HOWELL SMITH & LEE, PLLC**
1300 Summit Ave., Suite 700
Fort Worth, Texas 76102
(817) 509-2025; FAX (817) 509-2060

**Attorneys for Defendants Cattle Empire, LLC and Brookover Feed Yards, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, the foregoing document was filed with the Clerk of the Court in the foregoing case using the CM/ECF system, which sent notice of electronic filing to all electronic filing users in the case.

*/s/ David L. LeBas*
David L. LeBas