# EXHIBIT A



## PROMISSORY NOTE, CREDIT & SECURITY AGREEMENT

### CATTLE AND FEED FINANCING

Credit Document # 0720

This Promissory Note, Credit & Security Agreement ("Agreement") is entered into effective on January 1, 2022.

By and between:

**CATTLE EMPIRE, LLC, a Kansas limited liability company**
2425 RD DD
SATANTA, KS 67870  ("Lender")

and

Agridime, LLC
3000 South Hulen St
Fort Worth TX 76109
  ("Borrower").

## RECITALS:

A. This Promissory Note, Credit & Security Agreement has been established to provide Borrower with line of credit financing for the purchase of livestock.  In addition, this Agreement has been established to provide Borrower with additional financing for the hereinafter defined Feed and Care of livestock while in the possession of Lender.  All disbursements by Lender on behalf of Borrower shall collectively be referred to as "Credit Advances."

B. For the purpose of this Agreement, the term "Feed and Care" shall be defined as commercial feed and care services provided for the benefit of Borrower and/or Borrower's livestock.  Feed and Care services shall include feed inventory purchases, actual feed consumption, yardage, livestock transportation, funds advanced for Borrower's risk management transactions (both realized and unrealized), veterinary products and services, and other commercially reasonable expenses applicable to the feeding of and caring for livestock.

C. The parties desire to set forth the terms of their Agreement, and to provide for the terms of and security for repayment of Credit Advances.

**NOW THEREFORE,** for and in consideration of the mutual promises hereinafter set forth, the parties agree as follows:

1. <u>Line of Credit.</u>  Subject to the terms and conditions of this Agreement, Lender hereby grants Borrower a line of credit not to exceed $10,000,000 ("Credit Limit"), effective from the execution of this Agreement, and expiring on December 31 2023 ("Expiration Date").  For the limited purpose of calculating this credit limitation, only the unpaid amounts attributable to the purchase of livestock shall be accumulated and compared to the maximum line of credit amount.

2.    <u>Interest Rate.</u>    Interest shall accrue on the unpaid balance of Borrower's obligations under this Agreement at a rate equal to one month SOFR, as published in the *New York Federal Reserve*, plus 4.0% per annum, adjusted on the 1st day of each month, based upon the rate published and shown as effective on the last business day of the prior month.

3.    <u>Default Rate of Interest.</u> In the event of default as defined below, the interest rate shall be 5.0% above the then existing variable rate on this loan, retroactive to the date of default.

4.    <u>Promise to Pay.</u>    Borrower promises to pay to the order of Lender, and its successors and assigns, all outstanding indebtedness for Credit Advances thereon at the earliest of the following:

    (a) <u>Proceeds.</u>  From proceeds of livestock sales, as hereinafter provided.

    (b) <u>Maintenance Margin.</u>  Within 10 days, provided Lender has notified Borrower of Lender's demand for Borrower to make payments to reduce the outstanding indebtedness under this Agreement to an amount that satisfies the maintenance margin requirements defined in paragraph 9(f).

    (c) <u>Upon Demand.</u>  Within thirty (30) days following Lender's demand for full repayment, if so elected by Lender.

5.    <u>Grant of Security Interest.</u> Borrower hereby grants to Lender a security interest in the following property:

    (a) <u>LIVESTOCK:</u> All livestock (or proceeds there from) now owned or hereafter acquired by Borrower,

    (b) <u>INVENTORY:</u> All inventory of Borrower, including, but not limited to all livestock, and grain inventories, now owned or hereafter acquired by Borrower, and

    (c) <u>ACCOUNTS AND GENERAL INTANGIBLES:</u> All accounts and general intangibles now owned or hereafter acquired by Borrower including, but not limited to, all Borrower's rights in commodity and futures trading accounts for which Lender has provided financing, and all Borrower's rights in funds held in clearing accounts established by Lender for the purpose of accounting for the sale of cattle,

to secure payment and performance of all obligations, indebtedness, and liabilities of any kind, whenever and however incurred, absolute or contingent, due or to become due, now existing or hereafter arising of Borrower to Lender, including the liabilities arising because of Credit Advances under this Agreement.  Lender's security interest extends to all property of similar type or kind now owned or hereafter acquired by Borrower, including, but not limited to, all additions, accessions, replacements, substitutions, proceeds and products of the above described collateral, and all other accounts or general intangibles arising from sale or other disposition of the above described collateral.  All of the property described in this paragraph shall hereinafter collectively be referred to as the "Collateral."

6.    <u>Limitations on Collateral.</u>  Except as otherwise prohibited by this Agreement, Borrower may conduct livestock and other business operations separate and apart from the transactions contemplated by this Agreement. In such event, Lender agrees to execute such releases or subordination agreements, in form and substance approved by Lender, that clarify the scope of Lender's lien rights hereunder. Provided, however, that livestock owned by Borrower

and located at one of Lender's feedlots may not be financed by any other creditor without prior notification to and approval by Lender. Borrower further agrees that, in the absence of obtaining the prior written approval of Lender, livestock owned by Borrower and financed by any other creditor shall not be located in the same feedlots, grower yards, pasture, or proximity as livestock financed by Lender.

7.     Sale of Livestock. Borrower hereby appoints Lender as its agent for the purpose of negotiating the sale of Borrower's cattle to any purchaser that is deemed proper under the facts and circumstances. Lender agrees to utilize its best efforts to market and sell Borrower's cattle in accordance with traditional feed yard marketing practices. All proceeds from sales of secured livestock shall be remitted to Lender, for application as follows: repayment of any unpaid Credit Advances allocable to livestock currently or previously sold; and any additional amounts as reasonably determined by Lender to satisfy the maintenance margin requirements set forth in paragraph 9(f) of this Agreement. Lender reserves the right to add additional payees to checks for disbursements to Borrower, if Lender believes in good faith that such other payees may claim an interest in said funds. The Lender may also, in its sole discretion, elect to withhold reasonable reserves for the following purposes:

   (a)  Final Feed Bill. For payment of the final Feed and Care bill with respect to the sale of a specific lot (or lots) and/or pen (or pens) of cattle. In that event, Lender shall account to Borrower for the amounts, if any withheld by Lender within twenty (20) days of the sale of such cattle.

   (b)  Future Losses. For future anticipated cattle, feeding losses associated with any of Borrower's remaining cattle on feed at any of Lender's feed yard facilities, in order to satisfy the maintenance margin described in paragraph 9(f) below.

After application of the sale proceeds as above provided, any surplus shall be remitted to Borrower.

8.     Credit Advances. Subject to the terms and conditions of this Agreement, Lender is authorized to make Credit Advances until the Expiration Date, the Credit Limit is reached, or until a circumstance occurs which allows Lender to limit or withhold further Credit Advances. Credit Advances shall be initiated by either (a) a request from Borrower, pursuant to Lender's normal procedures, or (b) the need for Feed and Care of Borrower's livestock in Lender's possession (or as determined necessary in the circumstances of Off-Site Cattle as described in paragraph 10 below), as determined by Lender.

9.     Limitations on Credit Advances. Credit Advances shall be solely for the purchase of livestock to be placed in one of the Lender's feed yard facilities and payment of all Feed and Care expenses. Borrower shall initially fund 22% of the purchase price of livestock, or $100.00 per head (whichever is greater), and provide a detailed description of the livestock being purchased. The obligation of Lender to make Credit Advances under this Agreement shall further be subject to the following additional conditions:

   (a)  Representations and Warranties. All of the representations and warranties of Borrower made in this Agreement shall be true and correct on and as of the dates on which such Credit Advances are to be made, with the same effect as though such representations and warranties had been made on and as of said dates.

   (b)  No Default. There shall not exist any defaults hereunder on the dates of such Credit Advances.

Page 3 of 15

(c)  No Prohibition.  Credit Advances shall not be prohibited by any applicable law or order of any court or governmental authority, and shall not subject Lender to any penalty or other onerous condition under or pursuant to such law, regulation, or order.

(d)  No Change.  No material adverse change in the financial condition, business, or operations of Borrower or Guarantor(s) shall have occurred since the time of the financial disclosures provided by the Borrower and Guarantor(s) and the date of this Agreement.

(e)  Risk Management Programs.  At any time prior to and/or during the course of the loan, Lender may recommend or facilitate Borrower to develop and implement risk management programs provided, however, participation in any such program shall be at the sole discretion of Borrower.  In the event a risk management program is implemented, Lender may require Borrower to sign a separate hedge transaction facilitation agreement which further defines the responsibility of Lender with regard to any such risk management program.

(f)  Maintenance Margin.  Borrower's projected net realizable value of the cattle must exceed 22% of the fair value of the cattle.  Fair value of the cattle is the projected sales value of the cattle at a certain date using reasonable valuation determined in the exclusive judgment of Lender. Projected  net realizable value of the cattle is the fair value of the cattle less the unpaid balances of Credit Advances.

10.  Financing of Off-Site Cattle.  In the absence of express consent by Lender, this line of credit may not be drawn upon by Borrower for the purpose of purchasing livestock not physically located on the premises of Lender, or which will not be shipped directly to Lender's feed yard facilities immediately following purchase. In the event Lender grants permission to purchase livestock that do not satisfy this criteria, any such purchase shall be subject to the following conditions:

(a)  Lender's facilities.  Borrower shall ship the cattle to one of Lender's feed yard facilities for completion of the feeding cycle upon the earlier of (i) 90 days from the date of purchase, or (ii) within 5 days of being notified by Lender that it has sufficient lots available at its facility to accommodate such cattle.

(b)  Inspection.  Lender shall have the right to inspect all such cattle, at any time, pending their shipment to Lender's feed yard facilities.  The cattle must be, in the sole judgment of the Lender, sufficiently healthy for transport to Lenders feedyard, and must be prepared to begin the feeding cycle utilized by a commercial feedlot.

(c)  Branding.  All such cattle must be branded by Borrower with either the CE brand or Rx brand immediately following their purchase.  Lender will provide Borrower with the appropriate brand in that event.

(d)  Location.  If requested by Lender, Borrower must provide Lender with the detailed location of the livestock being financed by Lender.

(e)  Advance Approval.  Feed and Care financing will not be provided for any off-site cattle without specific advance approval in writing with regard to each load/lot of cattle to be financed by the Lender.

11.   Conditions to Commencing Credit Advances.  The obligations of Lender under this Agreement, in addition to being subject to the conditions set forth in paragraphs 8 and 9 hereof in relation to each of the Credit Advances, shall be contingent upon the Lender receiving all of the following (other than those items waived by Lender in writing), duly executed and delivered by all parties thereto in form, substance, and date satisfactory to Lender. All of which are hereby incorporated by reference.

(a)   Loan Guarantee.  Loan guarantee agreements as requested by Lender.  Including but not limited to the guarantee provided by Attachment A to this PROMISSORY NOTE, CREDIT & SECURITY AGREEMENT.

(b)   Further Assurances.  Any other instrument which Lender has requested pursuant to this Agreement.

(c)   Security Interests. Satisfactory evidence of the perfection of the security interests created by this Agreement. By execution of this Agreement, Borrower expressly authorizes Lender to file UCC financing statements, covering the Collateral continuations, amendments, and terminations, all without the further consent of Borrower.

(d)   Proceedings and Incumbency. If Borrower is an organization, a signed certificate by a duly authorized officer, member or partner of the organization, dated contemporaneously herewith, certifying that attached thereto is a true and correct copy of the resolutions adopted by its Board of Directors, members or partners, authorizing the making and performance of this Agreement, and that also attached thereto is a true and correct copy of its organizational documents and all amendments thereto in effect as of the date of this Agreement.  See attachment B  for form of certificate to be used.

(e)   Certificate of Good Standing.  If the Borrower is an organization, a signed certificate of the Secretary of State of the State of formation, in regular form, dated within twenty (20) days of the date of this Agreement, certifying that Borrower is duly formed and in good standing.

(f)   Additional Matters. Any other documents, instruments, or opinions of counsel which Lender may have reasonably requested, including but not limited to the authorization documentation provided by Attachment B to this Promissory Note, Credit and Security Agreement. By execution of this Agreement, Borrower is authorizing Lender to perform credit checks and additional research in any manner determined appropriate by the Lender.

12.   Representations and Warranties.    To  induce  Lender  to  enter  into  this Agreement and to make Credit Advances, Borrower represents and warrants to Lender that:

(a)   No Default.  No event has occurred and is continuing which constitutes a default hereunder, notwithstanding that no default may have been declared by Lender.

(b)   Title to Properties.  Borrower has or will have at the time of acquisition good and marketable title to the Collateral, subject to no lien, claim, mortgage, or other encumbrance, except as disclosed herein.  Borrower further agrees that should it be discovered that the Borrower does not have good and marketable title to the collateral; the Lender may at its sole discretion make a Credit Advance to any lienholder under

the terms of paragraph 14 of this Agreement in order to provide the Lender with clear title to the Collateral.

(c) <u>Organization.</u> If Borrower is an organization, Borrower is duly organized, validly existing, and in good standing under the laws of the State of formation, with full powers and authority to own and operate its properties and to carry on its business as it is now being conducted, and is in good standing in every jurisdiction in which the property owned by Borrower or the nature of the business conducted by it makes such qualification necessary.

(d) <u>Authorization.</u> Borrower has duly taken all actions necessary to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder.

(e) <u>No Conflicts or Consents.</u> The execution and delivery by Borrower of this Agreement and the performance of its obligations hereunder do not and will not (i) conflict with or result in a breach of the articles of incorporation or bylaws of Borrower or any law, order, mortgage, or other agreement by which Borrower or any of its properties may be bound; or (ii) result in the creating of any lien, charge, or encumbrance upon the assets or properties of Borrower, except as provided in this Agreement.

(f) <u>Enforceable Obligations.</u> This Agreement, when duly executed and delivered, will be legal and binding obligations of Borrower.

(g) <u>Financial Statements.</u> The financial statements furnished to Lender by Borrower fairly represent the financial position of Borrower in all material respects as of the date thereof. Since the date of the latest financial statements and except as disclosed in writing to Lender, Borrower has not suffered any material adverse change in its financial condition, business or operations, and Borrower is not aware of any material adverse change in the financial condition, business or operations of any Guarantor.

(h) <u>Full Disclosure.</u> All statements made or information contained in this Agreement are true and complete. There is no material fact known to Borrower (other than ordinary industry risks) that has not been disclosed in writing to Lender which could materially and adversely affect the properties, business, prospects, or condition of Borrower.

(i) <u>No Litigation.</u> There are no proceedings or investigations by or before any arbitrator or authority pending or, to Borrower's knowledge, threatened against or affecting Borrower or any of the Collateral or, to Borrower's knowledge, any basis therefore, which, if unfavorably determined, would adversely affect the transactions contemplated by this Agreement.

(j) <u>Full Legal Name.</u> Borrower's full and exact legal name is set forth on the first page of this Agreement, along with Borrower's address for its principal place of business (if it is an organization) or address of primary residence (if it is an individual).

13. Affirmative Covenants of Borrower. Until the full and final payment of Borrower's indebtedness to Lender under this Agreement, Borrower agrees as follows:

(a) <u>Payment and Performance</u>.  Borrower shall make all payments required pursuant to this Agreement promptly as they become due.

(b) <u>Reporting Requirements</u>.  Borrower shall at all times during the term hereof maintain full and accurate accounts and records of its operations in accordance with generally accepted accounting principles, and provide updated financial statements to Lender on an annual basis (or more frequently, if so requested in writing by Lender).

(c) <u>Information and Inspections.</u> Borrower will furnish to Lender upon request information pertaining to any matter in connection with this Agreement or the business and operations of Borrower.  Borrower will, at reasonable times, permit authorized representatives of Lender to inspect Borrower's books and records and to make copies thereof.

(d) <u>Notice of Material Events.</u>  Borrower will promptly notify Lender (i) of any material change in its financial condition; (ii) of the occurrence of a default hereunder; and (iii), at least thirty (30) days prior to the occurrence thereof, of any change of name or principal place of business (if Borrower is an organization) or primary residence (if Borrower is an individual).

(e) <u>Maintenance of Existence and Qualifications.</u>  Borrower (if an organization) will maintain its existence and its rights and franchises in full force and effect and will qualify to do business as a foreign organization where required by applicable law.

(f) <u>Additional Duties of Borrower.</u>  Borrower shall execute all other documents as Lender may reasonably require in connection with this Agreement and comply with all terms and conditions of all other documents executed in connection with this Agreement.

(g) <u>Preservation of Collateral.</u> Borrower shall: (i) KEEP COLLATERAL FREE FROM ALL LIENS, ENCUMBRANCES AND SECURITY INTEREST (OTHER THAN THOSE CREATED BY THIS AGREEMENT) UNLESS THE LENDER CONSENTS IN WRITING, IN ADVANCE; (ii) defend Collateral against all claims and legal proceedings by persons other than Lender; (iii) initiate action reasonably deemed advisable by Lender to preserve Collateral or to establish, determine priority of, perfect, continue perfected, terminate, and/or enforce Lender's interest in it or rights under this Agreement and (iv) pay and discharge when due all taxes, license fees, levies, and other charges upon Collateral.

14.    <u>Performance on Borrower's Behalf.</u>  If Borrower fails to perform any covenant or Agreement contained herein or to pay any money that Borrower is required to pay hereunder, or if Lender reasonably believes that the value of Borrower's interest in any Collateral is, or may be, impaired for any reason, Lender, at its option, may perform such covenant or agreement, may disburse such sums, and may take such other action as Lender, in its sole discretion, deems necessary to protect the value of its interest in the Collateral or to secure the repayment of the indebtedness hereunder.  Any amounts disbursed or expenses incurred by Lender pursuant to this paragraph, with interest thereon, shall be considered a Credit Advance under the terms of this Agreement and shall be due and payable on demand; shall be secured by the Collateral, and shall be deemed a part of Borrower's indebtedness to Lender.  Nothing shall require Lender to incur any expense or take any action, and no payment or action by Lender shall constitute a waiver of any default by Borrower.

15.    Default.    Borrower is in default of this Agreement under the following circumstances: (a) failure to repay principal or interest as provided in this Agreement; (b) breach of any term, condition or representation by Borrower under this Agreement; (c) if any of Borrower's representations to Lender in connection with this Agreement are determined by Lender to be materially false; (d) if Lender determines, in its sole discretion, that Borrower is unable to repay the indebtedness, or Lender otherwise deems itself insecure; (e) if Borrower uses disbursements for a purpose other than the stated purpose; (f) loss, theft, damage, destruction, unauthorized sale or encumbrance to or of any Collateral, or the making of any levy, seizure, attachment for or on any Collateral; (g) if, solely in Lender's judgment, Borrower has experienced a material adverse change in financial condition; (h) death, dissolution, termination of existence, insolvency, business failure, petition for or appointment of a receiver, assignment for the benefit of creditors by, or commencement of any proceeding under any bankruptcy or insolvency law by or against Borrower, or any guarantor, endorser or surety for the Borrower; or (i) Borrower is in default under the terms of any other agreement entered into between Borrower and Lender, including, but not limited to hedging agreements entered into with Lender or USPB share usage agreements, or (j) Borrower has misrepresented (either orally or in writing) the type, quality or location of cattle for which advances have been made.

16.    Secured Lender's Rights And Remedies. Upon default by Borrower under this Agreement, Lender shall have all of the rights and remedies provided under the Uniform Commercial Code or other applicable law. IT IS UNDERSTOOD THAT WITHOUT PRIOR NOTICE TO BORROWER OR AN OPPORTUNITY FOR HEARING, SECURED LENDER, IN ITS SOLE DETERMINATION THAT A DEFAULT HAS OCCURRED, MAY EXERCISE RIGHTS AND REMEDIES PROVIDED FOR UNDER THE UNIFORM COMMERCIAL CODE WHICH INCLUDE TAKING POSSESSION OF COLLATERAL, WITH OR WITHOUT AID OF LEGAL PROCESS, AND SUBSEQUENTLY DISPOSING OF IT. BORROWER AGREES WITH THE EXERCISING OF THESE RIGHTS AND REMEDIES BY LENDER AND VOLUNTARILY AND FREELY WAIVES SUCH RIGHTS, AS HE MAY HAVE, OF A NOTICE OF HEARING PRIOR TO LENDER'S EXERCISING SUCH RIGHTS AND REMEDIES. In lieu of, addition to, conjunction with, or substitution for these rights and remedies, Lender may enter upon Borrower's premises at any reasonable time to inspect Collateral and in the event of Borrower's default, to take possession of or to complete the growing, grazing, or fattening of the Collateral preparatory to its disposition, and for these purposes, Lender may require Borrower to assemble the Collateral and make it available to Lender at a place reasonably convenient to both parties.  Lender may resort to any security it may have, in the order it may deem proper, and notwithstanding any collateral security, Lender shall retain its rights of set off against Borrower. When Collateral is livestock, it is agreed that a commercially reasonable means of disposing of the Collateral shall include sale through a livestock market or through a licensed livestock sales company.  Lender will be entitled to a deficiency judgment against Borrower if the proceeds of sale do not pay all of the secured obligations.

17.    Miscellaneous.

(a)  Persons Bound. Borrower and Lender as used in this Agreement include the heirs, executors, administrators, successors, and assigns of these parties. If more than one Borrower executes this Agreement, their obligations shall be joint and several.

(b)  Waivers by Borrower. Borrower expressly waives demand for payment, protest and notice of dishonor on nonpayment.

Page 8 of 15

(c)    Non-Wavier by Lender.   No waiver of default by Lender shall operate as a waiver of any other default or of the same default on a future occasion.

(d)    Expenses.  To the extent applicable law allows, Borrower is liable for payment of all expenses pertaining to retaking, holding, preparing for sale, and selling of Collateral which would include, but not be limited to, all attorney's fees and legal expenses.

(e)    Merger.  This Agreement supersedes all prior oral negotiations, representations and promises which are hereby merged into this writing. This Agreement and any amendments, renewals or an extension to it constitutes the entire Agreement between Borrower and Lender.

(f)    Limitation of Scope.  Except as otherwise provided in transactions between Lender and Borrower, it is understood and agreed that Lender offers no service and assumes no obligation hereunder, aside from a creditor/Borrower relationship.  Without limiting the generality of the foregoing, no partnership or joint venture relationship is created between the parties hereto.

(g)    Acknowledgement of Risk.   Borrower acknowledges ownership of livestock is risky, and accepts such risks knowingly.

(h)    Renewal.   Borrower and Lender may agree to extend or renew the terms of this Agreement, or any of its terms or conditions, without giving notice to any other persons or entities who are, or who may become, liable for repayment. Other persons or entities who are or who may become liable for repayment of this indebtedness will remain liable under any extension or renewal. In no event shall Lender be required to extend or renew the terms of this Agreement.

(i)    Release.   If Lender releases any person or entity from liability under this Agreement or substitutes or releases any Collateral, the release of liability or substitution or release of Collateral shall not release any other person or entity from liability under this Agreement.

(j)    Evidence.   Lender's records shall be prima facie evidence of the balance owing Lender, and Borrower shall bear the burden of showing any fault or error.

(k)    Savings Clause.   If any provisions of this Agreement are found to be invalid or unenforceable, they shall no longer be considered to be a part of this Agreement. The remaining provisions shall be valid and enforceable.

(l)    Captions.   Captions used in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, or describe the scope or intent of any term or provision.

(m)    Choice of Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Kansas, including the Kansas Uniform Commercial Code (KSA 84-1-101 et seq, as amended), without reference to the choice of law doctrine of such state.

(n)    Forum Designation.   Any action or proceeding against any of the parties hereto relating in any way to this Agreement or the subject matter hereof shall be brought and enforced exclusively in the District Court of Haskell County, Kansas, and the parties

Page 9 of 15

hereto consent to the exclusive jurisdiction of such court in respect to such action or proceeding. Notwithstanding the foregoing, Lender shall be entitled to register and enforce a judgment obtained in Kansas in other jurisdictions.

**THIS WRITTEN AGREEMENT, TOGETHER WITH OTHER CREDIT DOCUMENTS REFERRED TO HEREIN IS THE FINAL EXPRESSION OF THE AGREEMENT BETWEEN BORROWER AND LENDER AND MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR OR CONTEMPORANEOUS ORAL AGREEMENT BETWEEN BORROWER AND LENDER. BY INITIALING BELOW, THE PARTIES AFFIRM THAT NO UNWRITTEN AGREEMENTS EXISTS BETWEEN BORROWER AND LENDER.**

**Borrower:**
**Agridime, LLC**

By:_____

Josh Link

**Lender:**

**CATTLE EMPIRE, LLC**

By: _____
Trista Brown-Priest
CEO

Date: ____7/1/22____

**ATTACHMENT A TO**
**PROMISSORY NOTE, CREDIT & SECURITY AGREEMENT**
**GUARANTY**

Credit Document # 0720

This Agreement is entered into effective on January 1, 2022

By and between:

**CATTLE EMPIRE, LLC, a Kansas limited liability company**
2425 RD DD
SATANTA, KS 67870  ("Lender")

And

Josh Link
3000 South Hulen St
Fort Worth TX 76109
   ("Guarantor").

In consideration of the financial accommodations provided to Borrower by Lender as set forth above, Josh Link (hereinafter "Guarantor", whether one or more), hereby provides this unconditional guaranty of payment on the following terms and conditions:

1.    Statement of Guaranty.  Guarantor agrees that it is Guarantor's intention to unconditionally guarantee payment of all past, present and future total indebtedness owed by Borrower to Lender, and any renewals thereof or continuance, or extensions, whether in whole or in part, together with all attorney's fees, costs and expenses of action against Borrower to enforce collection incurred by Lender in the collection this indebtedness.  If more than one Guarantor, the liability hereunder is joint and several.

2.    Scope and Duration. This is an absolute, continuing unconditional guaranty of payment. Notice of acceptance by Lender is waived. The Guaranty shall remain in full force until the Guarantor or any person duly authorized and acting on Guarantor's behalf delivers to Lender written notice terminating Guarantor's liability with respect to further loans and financial accommodations. No such notice shall effect or impair the obligations of Guarantor with respect to any indebtedness or undisbursed credit commitments existing as of the day of receipt of such notice, and interest thereon or any expenses incurred by Lender to collect any indebtedness or in enforcing this Guaranty. Any such notice of discontinuance by or on behalf of a Guarantor shall not effect or impair the obligations hereunder of any other Guarantor, if more than one.

3.    Limitation of Liability.  Guarantor's joint and several liabilities under this Guaranty shall not exceed the aggregated sum of any unpaid Credit Advances.

4.    Rights of Lender.  Guarantor agrees that Lender may, at its option, without notice to or further consent of Guarantor and without in any manner or to any extent affecting, releasing or diminishing the liability of Guarantor, take all or any of the following: actions; (a) may make loans and advances to Borrower from time to time and may alter, compromise, accelerate, extend or change the time or manner of the repayment of any indebtedness resulting from such loans or advances; (b) may release, surrender, and exchange Collateral given as security for indebtedness of Borrower; (c) may renew for any period of any indebtedness in whole or in part; (d) may retain or obtain in addition to this Guaranty a security interest in any property to secure all or any part of

Page 11 of 15

the indebtedness; (f) may release or compromise any liability of any of Guarantor hereunder or any liability of any of the party with respect to the indebtedness or any security thereof; (g) may create indebtedness in excess of the amount to which the right of recovery under the Guaranty is limited; and (h) may amend, modify, delete, or add any term of condition of or to the indebtedness.

5.    Extent of Liability. The amount of the liability of Guarantor shall not be reduced by any sum or sums at any time during the existence of this Guaranty paid by any of Guarantor, Borrower or any person liable for the indebtedness of Borrower. Lender may apply this Guaranty to such of Borrower's total indebtedness as it may elect.  Any liability of the undersigned shall in no way be impaired or affected if at any time the aggregate indebtedness of Borrower exceeds the amount guaranteed. The indebtedness includes all of the obligations of Borrower to Lender notwithstanding any right or power of Borrower or anyone else to assert any claim or defense as to the genuineness, regularity, validity, or enforceability of any such obligation or the collateral secured thereof.

6.    Application of Payment. Without written notice, Lender, in its sole discretion may apply all payments received from Borrower, from Guarantor or realized from any security in such an order or priority as Lender sees fit to any of the indebtedness of Borrower whether or not such indebtedness is due at the time of such application or is guaranteed, or until all indebtedness of Borrower to Lender has been paid in full even though such indebtedness is in excess of the liability hereunder. Guarantor shall have no right to enforce any remedy which Lender has of may have against Borrower and waives any benefit of and to participation in any security now or hereafter held by Lender.

7.    Waiver. The Guarantor waives:

(a) Notice of presentment, demand for payment or protest of any of Borrower's obligations or the obligation of any persons, firm, or corporation held by Lender as collateral security for Borrower's obligation;

(b) Notice of failure of any person, firm or corporation to pay to Lender any indebtedness held by Lender as collateral security and for any obligation of Borrower;

(c) All defenses, offsets and counterclaims which Guarantor may at any time have to any claim of Lender against Borrower; and

(d) Any right to demand diligence on the part of the Lender in proceeding against Borrower in seeking or exhausting legal remedies.

8.    Remedy of Lender.  Lender may at its option proceed in the first instance against Guarantor, jointly or severally, to collect any obligation covered in the Guaranty without first proceeding against Borrower or any other person, firm or corporation without first resorting to any property at any time held by Lender as collateral security.

9.    Subordination of Other Indebtedness. All existing, past and future indebtedness of Borrower to Guarantor is subordinated to all indebtedness guaranteed by this Agreement.

10.    Financial Statements.  The financial statements furnished to Lender by Guarantor and/or guarantors fairly represent the financial position of Guarantor in all material respects as of the date thereof.  Since the date of the latest financial statements and except as disclosed in writing to Lender, Guarantor has not suffered any material adverse change in its financial condition, business or operations.

Page 12 of 15

11.    Severability. Should any one or more provisions of the Guaranty be determined to be illegal or unenforceable all other provisions shall remain effective.

12.    Binding. The Guaranty shall be binding upon Guarantor, Guarantor's heirs, legal representatives, successors and assigns, and the obligations hereunder shall be binding on the estate of any deceased Guarantor for all indebtedness of Borrower thereafter incurred or accruing to Lender in absence of a termination notice as to future liabilities, the same as if death of such Guarantor had not occurred.

13.    Governing Law and Exclusive Venue. Guarantor agrees that this agreement shall be interpreted and enforced in accordance with the laws of the State of Kansas, and that exclusive venue properly lies in Haskell County, Kansas.

Josh Link

CATTLE EMPIRE, LLC

By: _____

Trista Brown-Priest
CEO

Date: _____7/1/22_____

**ATTACHMENT B TO**
**PROMISSORY NOTE, CREDIT & SECURITY AGREEMENT**

**CERTIFICATE OF ENTITY RESOLUTIONS**

I, Josh Link do hereby certify that I am the duly elected, qualified and acting President of Agridime, LLC that is duly organized and in good standing under the laws of the state of Texas.

I do hereby further certify that the following resolution was adopted by the Directors of said entity on January 1, 2022, to- wit:

> RESOLVED, that the following officers of this company, or their successors in office, be and they hereby are authorized, on behalf of and in the name of this company, to enter into the Promissory Note, Credit and Security Agreement with Cattle Empire, LLC, to-wit:

> Josh Link, President

I do hereby further certify that the aforesaid resolution remains in full force and effect, the same having been neither repealed nor amended.

I do hereby further certify that the organizational documents attached hereto (consisting of articles of incorporation and bylaws for a corporation; articles of organization and operating agreement of a limited liability company; and partnership agreement of a partnership) represent true and correct copies thereof, including all amendments thereto.

IN WITNESS WHEREOF, I have subscribed my name on this January 1, 2022.

Title: President

Page 14 of 15

## ASSIGNMENT

FOR VALUE RECEIVED, Cattle Empire, LLC ("Lender") hereby assigns, transfers, and grants a security interest: in the above Agreement and Guaranty, if applicable, and all proceeds and payments thereon, to Rabo Agrifinance, in its capacity as Agent for the benefit of the Lenders party to that certain Amended and Restated Credit Agreement dated as of October 31st, 2018, as amended ("Bank"). This assignment is delivered to secure repayment and performance of all obligations of Lender to Bank.

**CATTLE EMPIRE, LLC**

By: _____
Trista Brown-Priest
CEO

Date: _____7/1/22_____